IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ANTONIO RAMOS-CRUZ,

**Petitioner,**

**v.**

INÉS CARRAU-MARTÍNEZ, *et als.*,

**Respondents.**

**Civil No.** 20-1589 (FAB)

## OPINION AND ORDER

BESOSA, District Judge.

Petitioner Antonio Ramos-Cruz ("Ramos") is serving the first of three consecutive ninety-nine year term of imprisonment for the murders of Haydée Teresa Maymí-Rodríguez ("Maymí") and her two children, Eduardo Enrique and Melissa Morales-Rodríguez ("Eduardito" and "Melissa," respectively). See Puerto Rico v. Ramos-Cruz, CR-93-43 (P.R. Super. Ct. Jan. 26, 1999) (Judgment). On October 27, 2020, Ramos filed a petition pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEPDA"), 28 U.S.C. section 2254 ("section 2254"). (Docket No. 1.) Respondents Inés Carrau-Martínez and Lorraine Martínez-Adorno (collectively, "respondents") move to dismiss Ramos' section 2254 petition pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docket No. 46.) For the reasons set forth below, the respondents' motion to dismiss is **DENIED**.

## I.   Background[1]

Maymí married Eduardo Morales-Colberg ("Morales") in the
1980s. (Docket No. 39 at p. 42.)  The couple purchased a home in
Trujillo Alto, Puerto Rico, where they lived with their young
children, Eduardito and Melissa.   (Docket No. 39 at p. 15.)
Subsequently, Morales and Maymí separated.  Id.  Morales relocated,
but Maymí and the children remained at the Trujillo Alto residence.
Id.  Neighbors later informed law enforcement officers that Morales
was "jealous," "had been stalking Maymí," and "questioned [her]
when she would go out."   Id. at pp. 2 and 14.   During this
timeframe, Maymí had an affair with Juan Manuel Pagán-García (known
as "Juanma").   Id. at p. 2.   This relationship ended, however,
because Juanma was not "'man enough' to be with Maymí."  Id. at p.
20.   She had "made a fool of Juanma ('*le cogió de pendejo*') and
wanted another paramour ('*chillo*')."  Id. at p. 20.

The record does not identify who discovered the bodies, or
when the Puerto Rico Police Department ("PRPD") received notice
that a triple homicide occurred at the Trujillo Alto residence.
In June 1989, a person searching inside Maymí's home found her
lifeless body "in an advanced state of decomposition." Cruz, 2019

---

[1] The following allegations derive from Ramos' section 2254 petition, Docket
No. 39, and a decision by the Puerto Rico Court of Appeals, El Pueblo de P.R.
v. Cruz, Case No. KLCE201701397, 2019 WL 2232528 (P.R. Cir. Mar. 13, 2019)
(certified translation provided by the respondents, Docket No. 52, Ex. 1).

WL 2232528, at *39.   The culprits had placed her body inside a bathtub, "dressed in a sweatshirt rolled up to her breasts and green shorts, which were unbuttoned," over pink underwear. (Docket No. 39 at p. 19.)[2]   After killing Eduardito and Melissa, the culprits hid the children's bodies inside a refrigerator and a freezer.   Id. at p. 7.   The victims had been stabbed to death. Id. at p. 7.   A forensic pathologist noted the absence of bruising on Maymí's body.   Id. at p. 7.   The autopsy report revealed the presence of defensive wounds on her hands.   Cruz, 2019 WL 2232528, at *31.   Maymí had a shaved pubic area, "which the pathologist found rare in Puerto Rico at [that] time."   (Docket No. 39 at p. 38.)   Investigators recovered human hairs from the exterior of Maymí's underwear, but no semen.   Id. at pp. 19 and 25.

The PRPD investigation focused on Morales and Juanma.   Id. at p. 19.   A witness claimed that on the night of the murders, Maymí "ran out of the house screaming earlier in the evening that there had been a man spying on her through a window in the rear of the house."   Id. at p. 19.   The day before this incident, Juanma "had gone to look for Maymí in the early morning hours . . . and honked his horn while parked in front of her house."   Id. at p. 20. Juanma informed the PRPD that "he was with his girlfriend the night

---

[2] Neither Ramos nor the respondents specify the date of the murders, or who discovered the bodies.   The date set forth in this Opinion and Order is based on references to peripheral events in the section 2254 petition.

of Maymí's murder," but no attempts were made to corroborate this allegation.  Id. at p. 20.  Law enforcement officers arrested Juanma with a "kitchen knife in his car, a change of clothes, and a copy of El Vocero newspaper reporting on the triple murder." Id. at p. 20.  He was later released, however, and eliminated as a suspect.  Id.

Teenage siblings Bárbara and José Martínez-Maldonado ("Babi" and "Joíto," respectively) were the last persons to see Maymí alive.  Id. at p. 7.  Initially, they denied having any knowledge of the murders.  Id.  In fact, Channel 11 News interviewed Babi shortly after the crime.  Id. at p. 16.  She claimed to have "been with Maymí until 10:30 p.m. [,] and [that] she did not know anything else about the case."  Id.

Between June 1989 and December 1990, Puerto Rico prosecutor Andrés Rodríguez-Elías ("Rodríguez")[3] interviewed Babi and Joíto on numerous occasions.  Id. at p. 20.  After eighteen months of police inquiry, law enforcement officers informed Babi that "she was being charged with murdering Maymí and her two children."  Id.

---

[3] Rodríguez also prosecuted José Luis Latorre, José Caro-Pérez, Nelson Ruíz-Colón ("Ruíz"), and Nelson Ortiz-Álvarez in the late 1980s and early 1990s. (Docket No. 39 at p. 6.)  These defendants were wrongfully convicted and released after prevailing in post-conviction litigation.  Id.  Ruíz later alleged, inter alia, that Rodríguez "provided the two main witnesses in [his] criminal trial, with statements and photographs that were used by the witnesses to concoct a false story regarding their personal knowledge of the facts of the case."  See Ruíz-Colón, et al. v. Rodríguez-Elías, Civil No. 17-2223 (WGY) (D.P.R. Sept. 23, 2017) (Docket No. 1 at p. 16) (Complaint filed pursuant to 42 U.S.C. § 1983).

at p. 20 (emphasis in original).  In the final moments of a fifteen-hour interrogation, Babi's memory of that fateful night abruptly changed.  Id. at p. 21.  She provided prosecutors with a statement "placing [Ramos] and [Juan Carlos Meléndez-Serrano ["Meléndez"] at the scene of the crime."  Id.  Prosecutors interviewed Joíto the next day, "warning him that he was also suspected of the killings."  Id.  After another fifteen-hour interrogation, law enforcement officers received a revised statement.  Id.  Like his sister, Joíto suggested that Meléndez and Ramos committed the triple homicide.

In 1989, Ramos was nineteen-years old and worked at the Suiza Dairy pasteurizing plant with his uncle.  Id.  He lived "a couple houses away from [Maymí] with his aunt, uncle and four cousins."  Id. at p. 22.  The trial occurred in 1992 before the Puerto Rico Court of First Instance, Carolina Division ("Court of First Instance").  Id. at p. 21; see Pueblo de P.R. v. Ramos-Cruz, Case No. KLCE201701397.  Prosecutor Rodríguez alleged that Ramos and Meléndez attempted to rape Maymí, but that these two men failed to restrain and sexually assault her.  Id. at p. 9; see Cruz, 2019 WL 2232528, at *37 ("[T]he transcription of the trial on the merits indicates that the sexual act was the motivation for the commission of the crime of murder.") (Salgado-Schwarz, J.) (dissenting).  After Maymí overcame her assailants, Ramos and Meléndez then allegedly stabbed her and the two children repeatedly.  Id. at

p. 10.  This theory of the case rested predominantly on testimony provided by Babi and Joíto.  See Cruz, 2019 WL 2232528, at *28 ("Let us remember that [Babi and Joíto] were the only two witnesses that place [Ramos and Meléndez] inside [Maymí's] house, in her room, from 3:30 to 4:00 a.m. in the morning of June 26, 1989, that is, the moments that were closest in time to her time of death and that of her two children.").

### A.    The Trial Evidence[4]

Joíto claimed that at 10:30 p.m. on the night of the murders, he was at home watching a basketball game while Babi, Ramos, Meléndez, and a "group of people stood in front of Maymí's house."  (Docket No. 38 at p. 21.)[5]  At approximately 1:00 or 1:30 a.m., Joíto walked to Maymí's house "to look for his sister."  Id. at p. 22.  He "called out to [Babi] who came out of Maymí's residence."  Id.  At this juncture, Ramos and Meléndez were "standing near [the] house."  Id.  Joíto, Ramos, and Meléndez made "dumb comments" ("en forma de broma") and "tried to come up with an excuse to go in Maymí's house."  Id.  Meléndez stated that he

---

[4] This summary of the trial evidence is based on the limited record before the Court.  Ramos' trial occurred thirty years ago, in Spanish, before the Court of First Instance.  This Court has not yet reviewed the relevant transcripts and exhibits.

[5] Television station WAPA TV "was the exclusive broadcaster of Puerto Rico basketball games at that time."  (Docket No. 17 at p. 22.)  According to a WAPA TV representative, "no basketball games were transmitted" on the night of the murders.  Id.

"would like to have sex with Maymí." <u>Id.</u> According to Joíto, Maymí left her house because Babi took her keys. She then asked Joíto to look for Babi. <u>Id.</u>

Babi testified that "she hung out with Maymí that night starting around 7:00 p.m." <u>Id.</u> The two women walked to a local bakery, where Maymí called a person nicknamed "*el Prieto.*" <u>Id.</u> Maymí and Babi returned to the former's residence. <u>Id.</u> Babi then "left for some time and returned to find Maymí outside talking to Meléndez." <u>Id.</u> "She stayed and talked to them both." <u>Id.</u>

Morales arrived at Maymí's house at approximately 9:30 p.m. with Eduardito and Melissa. <u>Id.</u> at p. 23. Maymí, Morales and the children entered the residence. <u>Id.</u> Babi remained outside "talking to Meléndez and [Ramos] (who had walked over around that time)." <u>Id.</u> According to Babi, Meléndez asked her to "get Maymí's keys [inside her house] so he would have an excuse to talk to Maymí." <u>Id.</u> Babi allegedly entered Maymí's house, stole her keys, evaded detection by Maymí and Morales, and "then returned to hang out outside [the] house." <u>Id.</u> Ultimately, Babi returned home with Maymí's keys. Joíto subsequently "found Babi, got the keys from her and returned to Maymí's house." <u>Id.</u>

Joíto testified that when he "gave Maymí her keys," Ramos and Meléndez were allegedly still outside her house. <u>Id.</u> Either Ramos or Meléndez asked Maymí for a glass of water, stating that

this was their "opportunity" to "deal with" her.  <u>Id.</u>  Joíto avers

that he then went home, but returned five minutes later and "saw

Maymí's gate open and no one outside."  <u>Id.</u>  He allegedly:

> snuck into the dark first floor of Maymí's house and
> went up the stairs.  There . . . he saw [Ramos] leaning
> against the wall and heard the voices of Meléndez and
> Maymí who were inside the bedroom adjacent to the hallway
> . . . he did not see [Ramos] inside Maymí's room but in
> the hallway outside it while he heard Maymí and
> Meléndez's voices from inside the room.  Maymí said
> '[Meléndez], it's late.  Go home.  If you want we can
> talk later.'  But [Meléndez] did not want to, and the
> two started arguing.

<u>Id.</u> at. pp. 23-24.  Rather than leave, intervene, or call the

police, Joíto allegedly walked downstairs to "sit on Maymí's living

room sofa [to] think about what they might have been arguing about

upstairs."  <u>Id.</u> at p. 24.  After Joíto sat in solitude for

approximately ten minutes, Babi purportedly appeared "in the dark,

grabbed his arm and said 'Let's go.  We don't like this.  We don't

like what's going on upstairs."  <u>Id.</u>  Joíto and Babi then went

home.  <u>Id.</u>  At trial, Prosecutor Rodríguez described the murders

as:

> An event that shows you the participation of these two
> men, taking advantage of the late hours of the night,
> plan 'let's have carnal knowledge of her,' because she
> was a pretty woman, as her husband said she was a female,
> I liked her.  The irrepressible desire to have carnal
> knowledge of that women caused her death and it caused
> her death because she defended her honor . . . she did
> not give in to the pretentions of [Ramos and Meléndez]
> . . . she defended herself and died defending herself.

<u>Cruz</u>, 2019 WL 2232528, at *33.

A friend of Joíto and Babi testified that he observed the siblings in front of Maymí's house on the night of the murders, but "never saw [Ramos or Meléndez]" at this location.   <u>Id.</u> at p. 24.  Ramos' aunt stated that her nephew "did not leave the house that night after getting home around 9:30 p.m."   <u>Id.</u> at p. 26. Maymí's next door neighbor reported that at 4:00 a.m. she heard a woman yell, and the voice of a child screaming "don't hit me." <u>Cruz</u>, 2019 WL 2232528, at *28.  That morning, a neighbor observed "someone climb the gate to Maymí's house and leave in a blue car." (Docket No. 39 at p. 40.)  This neighbor later identified the intruder as Morales.  <u>Id.</u>

No physical evidence presented at trial placed Ramos at the crime scene.  The PRPD "could not identify a single fingerprint of value" in Maymí's bedroom.   <u>Id.</u> at p. 17.   Fingerprints recovered from an ashtray in another room belonged to Morales. <u>Id.</u>  The investigating prosecutor ordered that the PRPD seize various knives from the crime scene, "thinking one of them might be the murder weapon."  <u>Id.</u>  The PRPD failed to seize these knives, however, disregarding a direct order to preserve evidence.   <u>Id.</u> Law enforcement officers observed a "pair of bloody children's pants on the kitchen table," appearing as if they "had been used to wipe up blood."  <u>Id.</u>  They also discovered a mattress and sheets

with one "large blood stain" and "two smaller stains." Id. For a reason that defies logic, the pants and mattress were not recovered. Id. The sheets were placed in inventory "but never saved for forensic analysis." Id. at p. 18.

The day after the murders, neighbors informed Maymí's family that a "stench" emanated from the residence. Id. at p. 16. Flies swarmed the area. Id. Family members subsequently cleaned the crime scene, "threw away bloody clothing," and burned the "blood soaked mattress, an item [that] the prosecutor in charge had ordered [to] be collected." Id. A week later, her family again cleaned the residence, washed kitchenware, and packed Maymí's belongings. Id. They did not, however, recall "seeing or touching the murder weapon displayed at trial." Id. A cousin (now deceased) "gave much of these belongings to [Maymí's widower, Morales]." Id. at p. 17.

A PRPD officer later described the crime scene as an "uncontrolled situation," "unguarded" and contaminated by "looky-loos who were messing around with whatever they felt like." Id. at p. 18. Maymí, Eduardito, and Melissa were buried "without law enforcement" collecting hair samples, a precaution that could have potentially aided in the identification of the perpetrator(s) of the murders. Id. Unfortunately, the bodies "had to be exhumed so some hair comparisons could be made to hairs found at the scene

**and the murder weapon later found at [Morales'] house.**"   Id.
(emphasis added).  Five months after the murders, Morales' mother
found a "blood-and-hair-encrusted knife."   Id. at p. 21.   A
forensic analysis established that the blade of this knife is
consistent with the wounds sustained by the victims.   Id.
According to Morales, he received the knife from Maymí's cousin,
and retained an attorney.   Id.  The Puerto Rico Department of
Justice ("Department of Justice") analyzed hairs on Morales' knife
and tested Maymí's clothing for semen.   Id. at p. 25.   The hairs
on the knife belonged to Maymí.   Id. at p. 26.   "No semen or
biological material of anyone was found on Maymí's clothing."   Id.
at p. 37.   The hairs recovered from Maymí's underwear were not
tested.   Id. at p. 25.

Prosecutor Rodríguez acknowledged the lack of forensic
evidence, arguing that Ramos and/or Meléndez surreptitiously
returned to Maymí's house to clean the crime scene.   Id. at p. 26.
In closing argument, Prosecutor Rodríguez referred to the PRPD
investigation as a "comedy of errors."   Id.  He implored the jury,
however, to convict Ramos and Meléndez, quoting extensively from
the Christian Bible.   Id. at p. 27.   Specifically, he argued that
when "Jesus Christ arrived to Jerusalem, and went to the temple,
children began to surround him, and he picked up a child, putting
the child on his knee."   Id.  Prosecutor Rodríguez then paraphrased

Luke 18:15-17, stating that people in the Temple told Jesus "[get]
them [the children] out of here; they're a bother to the master."
Id. at p. 51.  But Jesus responded, demanding that they:

> [l]et the children come to me because creatures like
> these are the ones that elevate the kingdom of heaven,
> and [woe] to the one who hurts a child like these.  I
> tell you there will be no forgiveness on earth, nor will
> there be forgiveness in heaven . . . .  Why?  Because
> children are saints and I am sure that their mother,
> having done all she could do will find favor with the
> Lord, because she defended them, defended their home.

Id.  The defense witnesses purportedly lied because Puerto Rico
people "say untrue things to help others."  Id. at p. 26.

        The jury returned a guilty verdict on April 10, 1992.
Id. at p. 13.  Presiding Judge Hiram Sánchez-Martínez later wrote
that "had this been a bench trial, he would have found [Ramos] not
guilty."  Id. at p. 11.[6]

    B.    **Post-Conviction Litigation**

        Ramos and Meléndez filed a direct appeal.  Cruz, 2019 WL
2232528, at *4.   The Puerto Rico Court of Appeals ("Court of
Appeals") affirmed their convictions.  Id.  The Puerto Rico Supreme

---

[6]Although the record does not demonstrate it, Ramos must have moved for acquittal
at the close of all the evidence.  At that time Judge Sánchez-Martínez could
have decided the motion for acquittal even after the jury's guilty verdict.
Laws of P.R. Ann., tit. 34A, App. II, R. 135, but did not.  Years later, in
2019, Judge Sánchez-Martínez wrote a letter to the governor requesting executive
clemency for Ramos.  In his letter, Judge Sánchez-Martínez indicates that he
always had doubts that Ramos participated in the murders, that he heard no
evidence which would link Ramos to the murders and that the case is one of two
for which he has not remained satisfied.  (Docket No. 39-1) (Translation
attached.)

Court affirmed this disposition on January 26, 1999, holding that "there was enough evidence for a jury to [infer] that all of the elements of murder in the first degree were present, and to connect the defendants to the crime." Id. at *3.

More than a decade after trial, a serological hair-comparison of the evidence recovered from Maymí's underwear excluded Ramos as the donor. (Docket No. 39 at p. 28.) In sum, the hairs recovered from the crime scene belonged to a person other than Ramos. Id. On February 10, 2011, Ramos and Meléndez moved for a new trial pursuant to Puerto Rico Criminal Procedure Rule 192.1 ("Rule 192.1"), citing "(1) the alleged inappropriate conduct of Prosecutor Andrés Rodríguez-Elías, and (2) new evidence based on the results of a serological test of three pubic hairs taken from underwear belonging to [Maymí] and one body hair found

on a piece of clothing belonging to [Eduardito]." Id. at p. 5.[7]
The Court of First Instance denied this motion for two reasons.
First, Ramos and Meléndez knew of the alleged misconduct at the
time of trial but failed to assert a timely objection. Cruz, 2019
WL 2232528, at *4. Second, serological hair comparisons "existed
in 1992." Id.[8] The Court of First Instance suggested that Ramos
and Meléndez perform a mitochondrial deoxyribonucleic acid

---

[7] Puerto Rico courts "may in like manner at the request of the defendant grant
a new trial if, after the sentence is pronounced, new facts or new evidence are
found of a nature tending to establish defendant's innocence." P.R. Laws Ann.
tit. 34, R. 192.1. Rule 192.1.1 provides that "[a]ny person who is imprisoned
by virtue of a judgment rendered by any Division of the Court of First Instance"
may move to vacate, set aside, or correct the judgment if:

    (1) The sentence was imposed in violation of the Constitution of
        the laws of the Commonwealth of Puerto Rico or of the
        Constitution and laws of the United States; or

    (2) The court lacked jurisdiction to impose such a sentence; or

    (3) The sentence imposed exceeds the penalty prescribed by law; or

    (4) The sentence is subject to collateral attack for any reason.

Id. R. 192.1.1.

[8] Sister jurisdictions have held that serological hair comparison is
"scientifically invalid and unreliable." See, e.g., In re Stevens, 956 F.32d
229, 238 (4th Cir. 2020). In 2009, the National Academies of Science determined
that "testimony linking microscopic hair analysis with a particular defendant
is highly unreliable. In cases where there seems to be a morphological match
(based on microscopic examination), it must be confirmed using mtDNA analysis;
microscopic studies alone are of limited probative value." Nat'l Academies of
Sci., Strengthening Forensic Science in the United States (2009); see Smuel D.
Hodge, Jr. and Amelia Holjencin, A post-Morten Review of Forensic Hair Analysis:
A Technique Whose Current Use in Criminal Investigations in Hanging on by a
Hair, 64 St. louis L.J. 219, 228 (2020) ("The death knell of microscopic hair
analysis in a forensic context occurred in April 2015 when the FBI issued a
bombshell admission that members of its staff had provided inaccurate testimony
dealing with microscopic hair analysis for more than twenty years thereby
leading to the conviction of innocent people.").

("mtDNA") test, but this technology "was not [yet] available in

Puerto Rico."  Id.[9]

On January 29, 2016, the Puerto Rico legislature enacted

the Post Judgment DNA Analysis Act, P.R. Laws Ann. tit. 34, §§ 4201

---

[9] The Sixth Circuit Court of Appeals compared nuclear and mitochondrial DNA, explaining that:

> [E]very cell contains two types of DNA: nuclear DNA, which is found in the nucleus of the cell, and mitochondrial DNA, which is found outside of the nucleus in the mitochondrion. The use of nuclear DNA analysis as a forensic tool has been found to be scientifically reliable by the scientific community for more than a decade. The use of mtDNA analysis is also on the rise, and it has been used extensively for some time in FBI labs, as well as state and private crime labs. See, e.g., Micah A. Luftig & Stephen Richey, Symposium: Serenity Now or Insanity Later?: The Impact of Post-Conviction DNA Testing on the Criminal Justice System: Panel One: The Power of DNA, 35 New Eng. L. Rev. 609, 611 (2001). This technique, which generally looks at the differences between people's mitochondrial DNA, has some advantages over nuclear DNA analysis in certain situations. For example, while any given cell contains only one nucleus, there are a vast number of mitochondria. As a result, there is a significantly greater amount of mtDNA in a cell from which a sample can be extracted by a lab technician, as compared to nuclear DNA. Thus, this technique is very useful for minute samples or ancient and degraded samples. Ibid. In addition, mitochondrial DNA can be obtained from some sources that nuclear DNA cannot. For example, mtDNA can be found in shafts of hair, which do not have a nucleus, but do have plenty of mitochondria. Nuclear DNA can only be retrieved from the living root of the hair where the nucleus resides. United States v. Coleman, 202 F. Supp. 2d 962, 965 (E.D. Mo. 2002) (accepting expert testimony by Dr. Melton, the expert in this case, and admitting evidence based on mtDNA testing).

> On the other hand, mtDNA is not as precise an identifier as nuclear DNA. In the case of nuclear DNA, half is inherited from the mother and half from the father, and each individual, with the exception of identical twins, almost certainly has a unique profile. MtDNA, by contrast, is inherited only from the mother and thus all maternal relatives will share the same mtDNA profile, unless a mutation has occurred. Ibid. Because it is not possible to achieve the extremely high level of certainty of identity provided by nuclear DNA, mtDNA typing has been said to be a test of exclusion, rather than one of identification. Id. at 966.

United States v. Beverly, 369 F.3d 516, 528-29 (6th Cir. 2004)

*et seq.* <u>Cruz</u>, 2019 WL 2232528, at *4.[10]  A month later, Ramos and
Meléndez requested that the Puerto Rico Institute of Forensic
Sciences ("IFS") perform an mtDNA analysis.  <u>Id.</u>  The Court of
First Instance granted this motion without objection from the
Department of Justice.  <u>Id.</u>  The parties concur that the IFS
published the mtDNA report on September 28, 2016.  (Docket No. 55
at p. 11; Docket No. 46 at p. 3.)  This report excluded Ramos and
Meléndez from the population of potential donors:  The hairs on
Maymí's underwear belong to the victim or a matrilineal relative.
<u>Cruz</u>, 2019 WL 2232528, at *5.

        Ramos subsequently filed a second motion for a new trial
pursuant to Rule 192.1.  (Docket No. 39 at p. 14.)  A new trial is
warranted if:

> upon analyzing the new evidence along with the
> [evidence] presented during the original trial in the
> manner most favorable to the guilty verdict or ruling
> being challenged, **said evidence could have created
> reasonable doubt** in the trier of facts as to the guilt
> of the petitioner.

<u>Cruz</u>, 2019 WL 2232528, at *18 (citing <u>Pueblo v. Marcano-Parrilla</u>,
152 D.P.R. 557 (2000)) (emphasis in original); <u>see</u> <u>People v.</u>

---

[10] A certified English translation of the Post Judgment DNA Analysis Act is not
yet available.  According to the Innocence Project, this legislation "grant[s]
statutory access to DNA testing which could prove innocence and enable law
enforcement to identify the truly guilty."  Nick Moroni, <u>Puerto Rico Enacts
Post-Conviction DNA Testing Law</u> (Dec. 30, 2015) (available as of Sept. 9, 2022
at      https://innocenceproject.org/puerto-rico-enacts-post-conviction-dna-
testing-law/).

Morales-Rivera, 1984 PR Sup. LEXIS 87 (official translation), 115
D.P.R. 107 (1984) (noting that Courts adjudicate Rule 192.1 motions
by "[asking] whether said new evidence would have changed the
guilty verdict in the present case").[11]

According to Ramos, the mtDNA report "irrefutably
reveals that the pubic hairs collected from the panties belonging
to Ms. Maymí do not belong to either of the two men unjustly
convicted of this crime, whose motive was sexual assault and that,
consequently, they are excluded as the murderers of Ms. Maymí and
her two children." Cruz, 2019 WL 2232528, at *5.   Puerto Rico
Court of First Instance Judge Berthaida Seijo-Ortiz conducted a
six-day hearing.   Id.   Forensic serologist Roberto López-Arroyo
testified that microscopic hair analysis and mtDNA are "equally
reliable."   Id. at *7.   Chemist Phillip Hopper ("Hopper")
"explained the differences between the mitochondrial and nuclear
DNA tests," concluding that Ramos and Meléndez "are not the
donors." Id. at *8.

The Court of First Instance granted the second motion
for a new trial.   Id.   The forensic evidence was "relevant to the
controversy as to the identity of the person who committed the

---

[11] To prevail on a Rule 192.1 motion, the petitioner must also establish that
the newly discovered evidence "(1) could not have been discerned with reasonable
diligence before trial; (2) is not merely cumulative; (3) is not rebuttal
evidence; [and] (4) is credible." (Docket No. 52, Ex. 1 at p. 16) (citing Pueblo
v. Rodríguez, 193 D.P.R. 987, 998-1000 (2015)).

crime, and not merely cumulative or rebuttal evidence." Id. Once
the Department of Justice "decided not to test the hairs found on
the panties during the trial, the defense did not have access to
that evidence in order to submit it to scientific tests." Id.

     The Department of Justice appealed. Id. at p. 9. The
court of appeals, in an opinion by Judge Waldemar Rivera-Torres
joined by Judge Luisa Colom-García, determined that the mtDNA
evidence could not have been discovered in 1999, was not
cumulative, and was credible. Cruz, 2019 WL 2232528, at *21-24.
It disagreed, however, with the proposition that mtDNA is more
credible than hair comparison despite explicit testimony from
Hopper that the mtDNA test is "more convincing." Id. at *24.
Reasoning that the mtDNA evidence "does not make it more probable
that the respondents are innocent," the Court of Appeals reversed
the Court of First Instance, holding that it abused its discretion
in granting the motion for a new trial. Id. According to the
Court of Appeals, this evidence "does not add or subtract any
evidentiary value from the evidence presented during trial." Id.
at *28. The Department of Justice "argued during trial that the
motive of the murder was having sexual relations with the victim
(enjoying her)." Id. at *30. The Court of Appeals held, however,
that the "female lingerie, as an article of evidence against [Ramos
and Meléndez], was not material with regards to the guilty

verdict." Id. at *30.  Essentially, hairs found on the underwear

of the deceased victim are irrelevant to determining the identity

of the would-be rapist and murderer.

Puerto Rico Court of Appeals Judge Carlos Salgado-

Schwarz ("Salgado") dissented, noting that the Court of First

instance merely "[determined] that the scale of justice is no

longer leaning slightly towards the side of guilt." Id. at *37.

The majority misconstrued the Rule 192.1 standard of review,

analyzing the newly discovered evidence "not only in a manner that

is most favorable to the guilty verdict or judgment, but multiplied

by 1,000." Id.  Judge Salgado cautioned that "[no] one should

speak about the new evidence excluding or including [Ramos and

Meléndez] from being at the scene of the crime, because at the end

of this process, there is no witness who made any sworn statement

as to the moment in which the crime took place." Id. at p. 34.

The majority opinion required Ramos and Meléndez to "prove their

innocence," a feat not required by Rule 192.1 to obtain a new

trial. Id. at p. 34.  The Puerto Rico Supreme Court denied Ramos'

subsequent petition for certiorari.  (Docket No. 39 at p. 15.)

**C.   The Section 2254 Petition**

Ramos filed a pro se section 2254 petition on October 27,

2020.  (Docket No. 1.)  The Court granted Ramos' motion to proceed

in forma pauperis.  (Docket No. 14.)  On April 23, 2021, Ramos

filed an amended complaint with the assistance of counsel, the federal public defender. (Docket No. 39.)

He sets forth four causes of action. <u>Id.</u> First, Ramos contends that due process "require[s] a new trial based on [the mtDNA] evidence." <u>Id.</u> at p. 25. The court of appeals purportedly erred by concluding that "the new mitochondrial DNA evidence was not likely to change the result at trial" in violation of clearly established federal law. <u>Id.</u> at p. 35. Second, he asserts that the court of appeals relied on an "unreasonable determination of the facts in light of the evidence presented in the trial court evidentiary hearing." <u>Id.</u> at p. 4. Third, Ramos sets forth a claim of actual innocence. <u>Id.</u> at p. 5. Fourth, he argues that "cumulative trial errors, combined with new exculpatory evidence, render [his] trial fundamentally unfair." <u>Id.</u> at p. 49.

The respondents move to dismiss Ramos' 2254 petition pursuant to Rule 12(b)(6), contending that (1) the Puerto Rico courts "already adjudicated" the issues before this Court, (2) the statute of limitations precludes federal *habeas* relief, and (3) Ramos "does not comply with the actual innocence standard." (Docket No. 46.).

## II. **Federal Rule of Civil Procedure 12(b)(6)**

Pursuant to Rule 12(b)(6), defendants may move to dismiss an action for failure to state a claim upon which relief can be

granted.  See Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6)
motion, a complaint must contain sufficient factual matter "to
state a claim to relief that is plausible on its face." Bell Atl.
Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The Court must decide
whether the complaint alleges sufficient facts to "raise a right
to relief above the speculative level." Id. at 555.  In doing so,
the Court is "obligated to view the facts of the complaint in the
light most favorable to the plaintiffs, and to resolve any
ambiguities in their favor." Ocasio-Hernández v. Fortuño-Burset,
640 F.3d 1, 17 (1st Cir. 2011).  Motions to dismiss a section 2254
petition are subject to Rule 12(b)(6).  See Camacho v. Commonwealth
of Puerto Rico, 343 F. Supp. 2d 63, 64 (D.P.R. 2004) (Pieras, J.).

## III. The Anti-Terrorism and Effective Death Penalty Act

"Federal *habeas* review of [a] state-court conviction is
governed by the AEDPA." Foxworth v. St. Amand, 570 F.3d 414, 424
(1st Cir. 2009); 28 U.S.C. § 2254.  Petitioners invoke the AEDPA
to invalidate "the judgment authorizing [their] confinement."
Magwood v. Patterson, 561 U.S. 320, 321 (2010) (citation and
quotation omitted).  Congress enacted this statute "to further the
principles of comity, finality, and federalism." Kholi v. Wall,
582 F.3d 147, 154 (1st Cir. 2009) (quoting Williams v. Taylor, 529
U.S. 420, 436 (2000)).  Courts "shall entertain an application for
a writ of *habeas corpus* . . . only on the ground that [the

petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). To attain *habeas* relief, a petitioner must show that he or she has either exhausted all state court remedies for each claim raised, or that they are excused from exhausting those remedies because of an absence of available or effective state corrective processes. See 28 U.S.C. § 2254(b)-(c).

A state court conviction will survive *habeas* review unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. § 2254(d). "[W]hen the last state court to decide a prison's federal claim explains its decision on the merits in a reasoned opinion [*i.e.* the Puerto Rico Court of Appeals' decision denying Ramos' second motion for a new trial], a federal *habeas* court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." Porter v. Coyne-Fague, 35 F.4th 68, 75 (1st Cir. 2022) (quoting Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018)).

**A.   Prior Adjudication by Puerto Rico Courts**

The respondents move for dismissal because the Puerto Rico Court of Appeals "already adjudicated on the merits the claims that the petitioner brings before this Honorable Court." (Docket No. 46 at p. 13.)  This argument is meritless.  "[As] a matter of comity, federal courts should not consider a claim in a *habeas corpus* petition until **after** the state courts have had an opportunity to act."  Coningford v. Rhode Island, 640 F.3d 478, 482 (1st Cir. 2011) (quoting Rose v. Lundy, 455 U.S. 509, 511 (1982)) (emphasis added).  The respondents misunderstand the law.  Ramos is eligible for *habeas* relief **because** he pursued a new trial before the Puerto Rico courts.  Although this Court must afford deference to the Puerto Rico Court of Appeals, section 2254 specifically authorizes state prisoners, like Ramos, to seek federal relief once they have exhausted state remedies.  Porter, 35 F.4th at 75.

Ramos tethers his first, second, and third causes of action to the newly discovered evidence (*i.e.* the mtDNA report). (Docket No. 39 at pp. 25-42.)  The court of appeals adjudicated Ramos' second motion for a new trial in a published opinion.  See Cruz, 2019 WL 2232528.  The Puerto Rico and federal standards regarding newly discovered evidence are substantively identical. Compare United States v. Del Valle, 566 F.3d 31, 38 (1st Cir. 2009)

(holding that a federal defendant is entitled to a new trial on the basis of newly discovered evidence if "(1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to a lack of diligence by the defendant; (3) the evidence is material and not merely cumulative or impeaching; and (4) the emergence of the evidence will probably result in an acquittal upon retrial of the defendant"), with Pueblo de Puerto Rico v. Marcano-Parrilla, 2006 PR Sup. LEXIS 132, at *42 (official translation), 168 D.P.R. 721, 736 n.15 (2006) ("In order to be entitled to a new trial on the ground of newly discovered evidence, the movant must show that the evidence was discovered after trial, that it could not have been discovered with due diligence prior to trial, that it is material to the issue and not merely cumulative or impeaching, and that it is of such nature that a different verdict would probably result if the new trial was granted.") (emphasis omitted) (citing 66 Corpus Juris Secundum, New Trial, Sec. 130)).  In fact, the Puerto Rico Court of Appeals relied on Wright and Miller Federal Practice and Procedure for the newly discovered evidence standard. See Cruz, 2019 WL 2232528, at *18; Barresi v. Maloney, 296 F.3d 48, 52 (1st Cir. 2002) (holding that "a petitioner need not express his federal claims in precisely the same terms in both the state and federal courts . . . [The state claims] must be the 'substantial

equivalent' of those raised in his or her federal *habeas* petition.") (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971)).

To the extent that Ramos' claims before the Puerto Rico judiciary and this Court center on his request for a new trial based on the mtDNA evidence, the exhaustion requirement is satisfied.  <u>See, e.g.</u>, <u>González v. Estelle</u>, Case No. 93-55862, 1995 U.S. App. LEXIS 2466, at *8 n.1 (9th Cir. Feb. 8, 1995) ("Since the ultimate nature of the claim made by the appellant in state and federal court remains the same, namely, relief based on newly discovered evidence, we find that he has exhausted his claim.").  Indeed, the respondents concede that Ramos complied with the exhaustion requirement.  The essence of federal *habeas* relief is to ensure that state court convictions comport with federal law and the United States Constitution.  Holding that state court dispositions are immune from federal review, as the respondents urge this Court to do, would render section 2254 meaningless.

The fourth cause of action (*i.e.*, that cumulative errors resulted in an unfair trial) is not, however, a claim that the Puerto Rico courts have considered.  Ramos posits that the newly discovered evidence and "cumulative constitutional trial errors" nullify his conviction.  (Docket No. 39 at p. 49.)  The purported trial errors include:  (1) Puerto Rico's failure to "perform DNA

testing or serological testing on hairs and other materials,"
(2) the "prosecution's intentional failure to retain possible
exculpatory evidence," (3) the lack of time to prepare for trial,
and (4) the trial court erred in allowing the prosecutor to
incorporate "lengthy biblical quotes into closing argument." Id.
at pp. 49-52. The court of appeals referred to the "alleged
inappropriate conduct of Prosecutor Rodríguez" in passing, but did
not address this claim of constitutional error. Cruz, 2019 WL
2232528, at *4. The failure to perform forensic analysis, the
abysmal preservation of evidence, and the lack of time to prepare
for trial are issues not adjudicated by the court of appeals.
Accordingly, Ramos has filed a mixed-petition, "containing both
exhausted and unexhausted claims." Rose, 455 U.S. at 514. His
options are: "accept dismissal without prejudice and return to
state court to exhaust the claims presented in [his] section 2254
petition," or amend the section 2254 petition to remove the
unexhausted cause of action (i.e. the fourth claim). Nowacyzk,
299 F.3d at 75 (citing Rose, 455 U.S. at 510)). The following
analysis regarding the statute of limitations pertains solely to
Ramos' first three causes of action.

    **B.   The Statute of Limitations**

        The respondents assert that Ramos' section 2254 petition
is time-barred. (Docket No. 46 at p. 13.) The AEDPA sets forth

a one-year statute of limitations.  Currie v. Matesanz, 281 F.3d 261, 262 (1st Cir. 2002); see 28 U.S.C. § 2244(d)(1).  The limitations period runs from the latest of the following four dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C) the date on which the constitutional right was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d); see Jiménez v. Quarterman, 555 U.S. 113, 114 (2009) ("[The AEDPA's] one-year limitation for a state prisoner to file a federal habeas corpus petition . . . runs from the latest of four [statutorily] specified dates.").  Pursuant to section 2244(d)(2), the time "during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment is pending shall not be counted toward any period of limitation."  28 U.S.C. § 2244(d)(2); see Duncan v. Walker, 533 U.S. 167, 179 (2001) ("Section 2244(d)(2) promotes the

exhaustion of state remedies by protecting a state prisoner's ability to later apply for federal *habeas* relief while state remedies are being pursued.").

According to the respondents, the statute of limitations commenced on January 26, 1999, when the Puerto Rico Supreme Court affirmed Ramos' conviction. (Docket No. 46 at p. 15.) They rely on 28 U.S.C. § 2244(d)(1)(A) ("section 2244(d)(1)(A)"), which provides for a one-year statute of limitations for the filing of a *habeas* petition from the "date on which the judgment of conviction becomes final." Id.

The respondents are incorrect on two fronts. First, a conviction is final at the "end of the 90 day-period for filing a petition for writ of *certiorari* from the United States Supreme Court." Nowaczyk v. Warden, 299 F.3d 69, 70 (1st Cir. 2002) (citation omitted). Consequently, the date that Ramos' conviction became final is April 26, 1999.

Second (and more importantly), section 2244(d)(1)(A) is inapplicable. Section 2244(d) enumerates various trigger dates for when the statute of limitations begins to run, stating explicitly that "the limitation period shall run from the **latest**" of these dates. 28 U.S.C. § 2244(d) (emphasis added). The dispositive date of accrual is set forth in section 2244(d)(1)(D), "the date on which the factual predicate of the [petitioner's

claims] could have been discovered through the exercise of due diligence."  28 U.S.C. § 2244(d)(1)(D).  A "factual predicate" refers to "evidentiary facts or events, not court rulings or legal consequences of facts."  Holmes v. Spencer, 685 F.3d 51, 59 (1st Cir. 2012) (citation and quotation omitted).

The results contained in the mtDNA report form the factual predicate of Ramos' section 2254 petition.  Docket No. 39; see Rivera v. Nolan, 538 F. Supp 2d 429 (D. Mass. 2008) (holding that the statute of limitations commenced on the date that the petitioner received an affidavit by a witness recanting material testimony from trial).  Ramos moved for the mtDNA test thirty days after the Puerto Rico legislature enacted the Post Judgment DNA Analysis Act.  Cruz, 2019 WL 2232528, at *4.  This timely request demonstrates that Ramos exercised due diligence in obtaining newly discovered evidence.

The respondents maintain that Ramos "knew . . . that a mitochondrial test was necessary . . . to find purportedly new evidence" since April 4, 2012, when the Court of First Instance suggested this analysis.  Docket No. 46 at p. 17; see Cruz, 2019 WL 2232528, at *3.  Desire and feasibility are not synonymous, however, particularly for an inmate in state custody.  In 2012, the Department of Justice possessed the hairs recovered from Maymí's underwear.  Ramos had no right to access and test this

evidence until 2016, when the Post Judgment DNA Analysis Act became law.  <u>Cruz</u>, 2019 WL 2232528, at *4.  The respondents know this. Consequently, the date of accrual is September 28, 2016, when the IFS disclosed the mtDNA report.  (Docket No. 55 at p. 11; Docket No. 46 at p. 3.)  The following summary sets forth the statute of limitations computation.

**Continue to Next Page**

| DATE | EVENT | DAYS OF ACCRUAL |
|------|-------|-----------------|
| Sept. 28, 2016 | The IFS published the mtDNA report. <u>Cruz</u>, 2019 WL 2232528, at *4. | Date of Accrual. <u>See</u> 28 U.S.C. § 2244(d)(1)(D) |
| Oct. 17, 2016 | Ramos filed the second motion for a new trial before the Court of First Instance. <u>Id.</u> at *41. | 19 Days |
| Nov. 1, 2019 | The Puerto Rico Supreme Court denied Ramos' second motion to reconsider the denial of his petition for *certiorari*. (Docket No. 39 at p. 15.) | 0 Days. <u>See</u> 28 U.S.C. § 2244(d)(2)[12] |
| Oct. 27, 2020 | Ramos filed the section 2254 petition. (Docket No. 1.) | 361 Days |

**Total Days: 380 Days of Accrual**

As set forth above, Ramos filed his section 2244 petition 15 days

after the one-year statute of limitations expired. Absent

---

[12] <u>See, e.g.</u>, <u>Pérez-Pagán v. Mercado-Quiñones</u>, 179 F. Supp. 3d 174, 177 (D.P.R. 2016) ("It must be emphasized that motions under Rule 192.1.1 are a form of collateral attack . . . As such, pursuant to § 2244(d)(2), the time in which this motion is pending "shall not be counted toward any period of limitations under this subsection.") (Domínguez, J.); <u>Román v. Martínez-Adorno</u>, Case No. 19-1183, 2021 U.S. Dist. LEXIS 190270, at *4-5 (D.P.R. Sept. 30, 2021) ("Pursuant to 28 U.S.C. § 2244(d)(2), petitioner's Rule 192.1.1 motion filed before the Court of First Instance tolled the one-year statute of limitations from July 14, 2017 until December 4, 2017, a total of 143 days.") (Delgado-Colón, J.). The Court notes that the 90-day exclusion for requesting *certiorari* before the United States Supreme Court is inapplicable to tolling provision in section 2244(d)(2). <u>Lawrence v. Florida</u>, 549 U.S. 327, 332 (2007) (holding that "an application for state postconviction review . . . is not 'pending' after the state court's postconviction review is complete, and § 2244(d)(2) does not toll the 1-year limitations period during the pendency of a petition for *certiorari* [or the 90-day period for filing one].").

equitable tolling or the actual innocence exception, Ramos'
request for *habeas* relief is time-barred.

### C.   Equitable Tolling

Federal *habeas* petitions are "subject to equitable
tolling in appropriate cases." Holland v. Florida, 560 U.S. 631,
645 (2010); see Neverson v. Farquharson, 366 F.3d 32, 41 (1st Cir.
2004) ("We hold that the one-year statute of limitations period in
§ 2254(d)(1) is not jurisdictional and, accordingly, can be subject
to equitable tolling in appropriate cases."). Equitable tolling
"is the exception rather than the rule; resort to its prophylaxis
is deemed justified only in extraordinary circumstances." Cordle
v. Guarino, 428 F.3d 46, 48 (1st Cir. 2005) (citation and quotation
omitted); see Delaney v. Matesanz, 264 F.3d 7, 15 (1st Cir. 2001)
("[Equitable] tolling is strong medicine, not profligately to be
dispensed."). In Trapp v. Spencer, the First Circuit Court of
Appeals set forth six factors for district courts to consider in
determining whether equitable tolling is warranted:

> (1) The petitioner's own diligence in pursuing *habeas*
> relief.
>
> (2) Whether some extraordinary circumstances prevented
> the petitioner from making a timely filing.
>
> (3) The petitioner's diligence in the pursuit of other
> post-conviction remedies and the process already
> afforded in the state system.

(4) Any prejudice to the prosecution that would result from tolling and possible retrial.

(5) The fact that equitable tolling is not available in cases of dubious merit.

(6) Whether or not the case is a capital case and whether or not the petitioner has been sentenced to death.

479 F.3d 53, 61 (1st Cir. 2007) (citations omitted).  The equitable tolling doctrine is applied on a "case-by-case basis, avoiding mechanical rules and favoring flexibility."   Holmes, 685 F.3d at 62.

Ultimately, dismissal is warranted unless Ramos presents a compelling reason to suspend the statute of limitations.  Compare Reaves v. Vidal, Case No. 16-10169, 2017 U.S. Dist. LEXIS 35499, at *8 (D. Mass. Mar. 13, 2017) ("Petitioner's disability, combined with inadequate writing assistance, constitutes extraordinary circumstances warranting equitable tolling."); Pérez v. Suárez, Case No. 19-1555, 2022 U.S. Dist. LEXIS 137099, at *16-17 (D.P.R. Aug. 1, 2022) (invoking the equitable tolling doctrine because "counsel's oversight here was more significant than a routine error and appears to be the result of a complex set of legal and factual circumstances") (Young, J.), with Voravongsa v. Wall, 349 F.3d 1, 8 (1st Cir. 2003) (affirming the dismissal of a section 2254 petition because the "policy of liberal construction [associated with *pro se* litigants] cannot plausibly justify a party's failure

to file a *habeas* petition on time") (citation and quotation omitted); Holmes v. Spencer, 822 F.3d 609, 612 (1st Cir. 2016) (affirming the dismissal of a section 2254 petition, holding that erroneous advice from counsel and "limited access to the prison law library" did not excuse a statute of limitations violation) (citation omitted); Domínguez v. Duval, 527 F. App'x 38, 40 (1st Cir. 2013) (affirming dismissal of a section 2254 petition, holding that prolonged mail distribution in prison did not excuse failure to comply with the statute of limitations) (Souter, J.).

### 1.   Trapp Factors 1 and 3:  Diligence

Ramos has satisfied the first and third Trapp factors.  The "diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence." Drew v. MacEachern, 620 F. 16, 23 (1st Cir. 2010).  Ramos filed the section 2254 petition from state prison without the assistance of counsel, moved to proceed *in forma pauperis*, consulted with his attorneys to amend the petition, and timely opposed the respondents' motion to dismiss.  (Docket Nos. 1, 5 and 55.)

In state court, Ramos pursued a new trial for thirty years with persistence.  The Puerto Rico courts denied his direct appeal. Cruz, 2019 WL 2232528, at *3.  Ramos then requested a new trial based on the serological hair comparison. Id. at *4.  The Court of First Instance denied this motion because he "[needed] to

perform a mitochondrial Deoxyribonucleic Acid (DNA) test." Id.
But this test was "not available in Puerto Rico." Id. Thirty
days after the enactment of the Post Judgment DNA Analysis Act,
Ramos moved for the mtDNA test. Id. Less than a month after
receiving the results, Ramos filed a second motion for a new trial.
Id. The Court of First Instance granted this motion. Id. The
Court of Appeals then reserved this decision. Id. The Puerto
Rico Supreme Court denied *certiorari* and two motions to reconsider
that disposition. Ramos has appeared before every stratum of the
Puerto Rico judiciary to litigate non-frivolous issues for three
decades, demonstrating due diligence in satisfaction of the first
and third Trapp factors.

### 2.   **Trapp** Factor 2:  **Extraordinary Circumstances**

To prevail, Ramos must establish that he
"diligently pursued [his] rights, but some extraordinary
circumstance, or obstacle, prevented timely filing." Blue v.
Medeiros, 913 F. 1, 8 (1st Cir. 2019) (citing Holland, 560 U.S. at
649). "Extraordinary circumstances" pertain to the conditions
that caused the untimely petition, not the underlying facts
resulting in the conviction. Barreto-Barreto v. United States,
551 F.3d 95, 101 (1st Cir. 2008); Trapp, 479 F.3d at 60 ("In
applying the equitable tolling doctrine, an important factor is
the reason for the late filing.").

The circumstances in this case are extraordinary for two reasons. First, the date of accrual is an approximation. (Docket No. 1.) As a *pro se* petitioner in state custody, Ramos is entitled to the mailbox rule. In Morales-Rivera v. United States, the First Circuit Court of Appeals held that "a *pro se* prisoner's motion under 28 U.S.C. § 2255 or § 2254 is filed on the date that it is deposited in the prisoner's internal mail-system for forwarding to the district court." 184 F.3d 109 (1st Cir. 1999); see Rules Governing 2254 Cases, Rule 3(d) ("A paper filed by an inmate confined in an institution is timely if deposited in the institution's internal mailing system on or before the last day for filing). Generally, the Clerk of the Court files the envelope containing a section 2254 petition on the docket. The postmark date on the envelope indicating when the prison mail service received the section 2254 petition is the operative date. See, e.g., Breese v. Maloney, 322 F. Supp. 2d 109, 112 n.2 (D. Mass. 2004) (relying on the date on "the envelope forwarding the file fee" from a *pro se* inmate pursuant to the mailbox rule).

For reasons not evident to this Court, the envelope Ramos sent from state prison (Correctional Institution Bayamón 501) is absent from the docket. See Docket No. 1. If this date is unknown, courts "look[] to the date that [the] plaintiff signed the relevant papers." Holmes v. Fisher, Case No. 09-829S(F), 2013

U.S. Dist. LEXIS 87124, at *19-20 (W.D.N.Y. June 20, 2013) (internal citation and quotation omitted); see Jenkins v. Johnson, 330 F.3d 1146 (9th Cir. 2002) ("Jenkins signed his federal *habeas* petition on April 7, 1998; accordingly, his filing date could have been as early as then."). Ramos signed, but did not date, his section 2254 petition. (Docket No. 1 at p. 18.) The Court has no basis to infer that Ramos purposely omitted the date of signature to evade the statute of limitations, anticipating that the Clerk of the Court would discard the concomitant envelope. The Rules Governing Section 2254 Cases suggest that "[timely] filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or by a notarized statement, either of which must set forth the date of deposit and state that first class postage has been prepaid." Rules Governing 2254 Cases, Rule 3(d). Ramos mailed the section 2254 petition nearly two years ago. This Court will not require him to recollect the precise date of mailing. Because application of the mailbox rule is not feasible, the Court's statute of limitations computation necessarily overstates the days of accrual.

A myopic review of the record suggests that Ramos' failure to file a timely petition is unexceptional. A *pro se* inmate flouting a statutory deadline is hardly remarkable. The Court is nevertheless satisfied that this case is extraordinary,

particularly when considering its procedural history through the
Puerto Rico court system.    In contrast to section 2244(d),
Rule 192.1 provides that a motion for post-conviction relief "may
be filed at **any** time."   Laws P.R. Ann. tit 34A, § II, R. 192.1
(emphasis added).   The Court is cognizant that this distinction
does not, without more, overcome the presumption against equitable
tolling.   Ramos is a *pro se* litigant, however, who has diligently
pursued post-conviction relief for three decades.   Indeed, Ramos
prevailed before the Court of First Instance on his second motion
for a new trial.   Equitable considerations preclude this Court
from dismissing Ramos' section 2254 petition because he filed his
first federal pleading a mere 15 days after the statutory deadline.

        Indeed, even the respondents failed to identify the
correct date of accrual.   See Cruz-Berríos v. Borrero, Case No.
14-1232, 2019 U.S. Dist. 172219, at *19 (D.P.R. Aug. 19, 2019)
(recommending that the district court apply the equitable tolling
doctrine "[c]onsidering the complicated procedural gridlock in
this case, which even confused respondents as they originally
miscalculated the statute of limitations cut-off date, it would be
unfair to expect Cruz-Berríos to possess the procedural legal
acumen to time each petition") (Delgado-Colón, Mag. J.).   This
Court notes that Ramos filed the section 2254 petition just 361
days after the Puerto Rico Supreme Court denied his second motion

for reconsideration.  (Docket No. 39 at p. 15.)  The federal *habeas* regime is labyrinthine even for experienced practitioners versed in the law.  Inferring that the date of accrual is the date that the Puerto Rico Supreme Court denied Ramos' second motion for reconsideration is not unreasonable.  Accordingly, the totality of the circumstances establish that equitable tolling is appropriate in this case.

### 3.    __Trapp__ Factor 4:  Prejudice to the Prosecution

A new trial will prejudice the respondents. Witnesses may have passed away or moved to remote locations.  The trial evidence may have been lost or destroyed.  These obstacles are, unfortunately, characteristic of every retrial for crimes occurring in the distant past.  The unavailability of evidence is attributable, in part, to the PRPD and the Department of Justice themselves.  These entities failed to secure the crime scene and preserve evidence.  Accordingly, this factor only marginally undermines the application of equitable tolling.

### 4.    __Trapp__ Factor 5: Ramos' Claims are Credible

The First Circuit Court of Appeals has held that equitable tolling cannot revive a *habeas* claim of "dubious merit." Lattimore v. Dubois, 311 F.3d 46, 56 (1st Cir. 2002) (citation omitted).  Ramos prevailed before the Court of First Instance. Cruz, 2019 WL 2232528, at *9-10.  A divided Court of Appeals then

reversed the new trial disposition over a strong dissent.  <u>Id.</u> at *33.  The Puerto Rico courts have disagreed about the propriety of a new trial, demonstrating that the claims asserted by Ramos are far from dubious.  Consequently, this <u>Trapp</u> factor supports the suspension of the statute of limitations.

     5.    **<u>Trapp</u> Factor 6: Ramos is Not Death Penalty Eligible**

Ramos is not eligible for the death penalty.  <u>See</u> P.R. Const. Art. II, § 7 ("The death penalty shall not exist.").  Accordingly, this factor does not support the application of equitable tolling.

Because the first, second, third, and fifth <u>Trapp</u> factors weigh in favor of equitable tolling, Ramos' section 2254 petition is timely.  The Court need not resolve whether tolling of the statute of limitations is proper pursuant to the actual innocence exception because Ramos' section 2254 is timely pursuant to the equitable tolling doctrine.

**V.   Conclusion**

For the reasons set forth above, the respondents' motion to dismiss is **DENIED.**  (Docket No. 46.)  **No later than October 10, 2022,** Ramos shall either amend the section 2254 petition to eliminate the non-exhausted cause of action (*i.e.* claim four), or move for dismissal of his entire petition without prejudice.  <u>See</u> <u>Supra</u> Part III(A).  Should Ramos amend his section 2254 petition,

the respondents shall answer the second amended petition no **later than October 31, 2022**.  <u>See</u> Rules Governing 2254 Cases, Rule 5(a) ("The respondent is not required to answer the petition unless a judge so orders.").

    **IT IS SO ORDERED**.

    San Juan, Puerto Rico, September 13, 2022.

 

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
SENIOR UNITED STATES DISTRICT JUDGE