IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ANTONIO RAMOS-CRUZ,

    **Petitioner,**

        **v.**                   **Civil No.** 20-1589 (FAB)

DOMINGO EMANUELLI-HERNÁNDEZ, *et al.*,

    **Respondents.**


**OPINION AND ORDER**

BESOSA, District Judge.

    Before the Court is Petitioner Antonio Ramos-Cruz ("Ramos")'s second amended petition for *habeas corpus* relief, filed pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEPDA"), 28 U.S.C. section 2254 ("section 2254"). (Docket No. 63.) For the reasons set forth below, Ramos' section 2254 petition for a new trial is **GRANTED.**

**I.  Factual Background**

    This *habeas corpus* petition pertains to the horrific murders of Haydée Teresa Maymí-Rodríguez ("Teresa") and her two children, Eduardo Enrique and Melissa Morales-Rodríguez ("Eduardito" and "Melissa," respectively). See Puerto Rico v. Ramos-Cruz, CR-93-43 (P.R. Super. Ct. Jan. 26, 1999) (Judgment). On February 24, 1992, a jury convicted Ramos and Juan Carlos Meléndez-Serrano ("Meléndez") of first-degree murder after a ten-day trial

revealed, *inter alia*, that the Puerto Rico Police Department failed to preserve critical evidence and contaminated the crime scene, the murder weapon abruptly appeared at Teresa's estranged husband's home months after the triple homicide, and two eyewitnesses recanted their initial statements to police following a nine-hour interview at the Department of Justice and threats of prosecution.  The summation set forth below encapsulates the 2,236-page trial transcript, translated into English by the Commonwealth of Puerto Rico after protracted litigation.  (Docket No. 186, Exs. 1-11; Docket No. 201.)[1]

### A. Teresa's Strained Relationship with Eduardo Morales-Colberg

Teresa married Eduardo Morales-Colberg ("Morales") in 1984.  (Docket No. 186, Ex. 2 at p. 209.)  She was just 19 years

---

[1] The Court of First Instance conducted *voir dire* proceedings for seven days, swearing in the jury on February 6, 1992.  (Docket No. 98, Ex. 1 at p. 25.) The Court of Appeals maintains that the trial "lasted eleven days."  Puerto Rico v. Ramos-Cruz, Case No. KLCE201701397, 2019 WL 2232528, at *1 (P.R. App. Mar. 13, 2019) (certified translation, Docket No. 52, Ex. 1.)  The record demonstrates, however, that Ramos and Meléndez stood trial for ten days before Judge Hiram Sánchez-Martínez in the Superior Court of Puerto Rico, Carolina Division.  (Docket No. 98, Ex. 1 at p. 25.)  Defense attorneys Walter Alomar and Jorge Alvarado-Haddock represented Ramos and Meléndez, respectively. (Docket No. 186, Ex. 1 at p. 1.)  Prosecutors Andrés Rodríguez-Elías ("Rodríguez"), Francisco Cervoni, and Nazario Lugo-Silvagnoli represented the Commonwealth of Puerto Rico.  Id.  Rodríguez also prosecuted José Luis Latorre, José Caro-Pérez, Nelson Ruiz-Colón ("Ruiz"), and Nelson Ortiz-Álvarez in the late 1980s and early 1990s.  (Docket No. 39 at p. 6.)  These defendants were wrongfully convicted and released after prevailing in post-conviction litigation.  Id.  Ruiz later alleged, *inter alia*, that Rodríguez "provided the two main witnesses in [his] criminal trial, with statements and photographs that were used by the witnesses to concoct a false story regarding their personal knowledge of the facts of the case."  See Ruiz-Colón v. Rodríguez-Elías, Civil No. 17-2223 (WGY) (D.P.R. Sept. 23, 2017) (Docket No. 1 at p. 16) (Complaint filed pursuant to 42 U.S.C. § 1983).

old.  (Docket No. 186, Ex. 3 at p. 154.)  The couple subsequently had two children:  Eduardito in 1984 and Melissa in 1986.  (Docket No. 186, Ex. 2 at p. 209.)  According to Morales, he used cocaine and occasionally smoked marijuana with Teresa.  (Docket No. 186, Ex. 2 at p. 251.)

Morales, Teresa, and their children moved into a duplex in Lomas de Trujillo Alto in April, 1989.  Id. at p. 126.  "Like many married couples," Morales and Teresa "[had] problems." (Docket No. 186, Ex. 1 at p. 122.)  He "was jealous and questioned [Teresa] when she went out."  Id. at p. 124.  In May 1989, the couple "separated."  Id. at p. 126.  Morales moved to his mother's house in Santurce, Puerto Rico.  Id. at p. 18.[2]

Teresa's first cousin, Nydia Magalie Agosto-Rodríguez ("Agosto"), testified that Teresa physically abused Morales, but that Morales "would not abuse [her]."  Id. at p. 124.  According to Agosto, "the true reasons for [Morales] and [Teresa's] separation [was] that she no longer loved him."  Id. at p. 185. Morales testified that he separated from Teresa because "she wanted to be alone [. . .] to clarify her feelings."  (Docket No. 186, Ex. 2 at p. 234.)  In fact, two months before her murder, Teresa confided to Morales that "she had fallen out of love with [him]."

---

[2] Carmen Rosa Colberg ("Colberg") is Morales' mother.  (Docket No. 186, Ex. 5 at p. 24.)

Id. at p. 236.  Morales testified, however, that he and Teresa "ended things on good terms, separated amicably, [and] had a good relationship."  Id. at p. 252.

Agosto alleged that a man named "Juanma el Prieto" ("Juanma") was "[Teresa's] friend, [and] that he wanted to help her, nothing more."  Id. at p. 183.  She previously disclosed to investigators, however, that Teresa and Juanma had an affair. Id.  Agosto denied having made this statement.  Id.  The Friday before her murder, Teresa accompanied a man named "Javier" to his family's house in Aibonito, Puerto Rico.  Id.  They spent the night "at a party" there.  Id.

**B.    The Trujillo Alto Residence**

Teresa's duplex consisted of three bedrooms and a bathroom, all situated on the second story.  (Docket No. 186, Ex. 2 at p. 39.)  The kitchen, living room, laundry room and a half-bathroom were downstairs.  Id.  Teresa slept on a mattress without a bedframe, surrounded by minimal furniture.  Id. at p. 40.  The front gate to the property was broken, "[coming] off its hinges completely."  Id. at p. 57.

Visibility within the duplex was "quite poor" because the couple "had only installed one lamp in the kitchen [and another] in [Melissa's] room."  Id. at p. 42.  Teresa "asked her husband on several occasions [. . .] to install some lights [,

but] he never did." Id. at p. 118.  Agosto suspected that Morales "had not intervened [in repairing the house] to pressure [Teresa] to get back together." Id. at p. 119.  Morales confirmed that the home "was missing a few things, some fixtures for the light bulbs." Id. at p. 213.

The house had two entrances, a front door leading to the living room and a back door opening into the kitchen.  Id. at p. 44.  Teresa lost the keys to the front gate of her duplex, requiring her to remove "slats" from the windows near the back door." Id. at p. 54.  Once inside the kitchen, Teresa "would put the slats back again." Id.  Morales ultimately provided Teresa with a duplicate set of keys.  Id. at p. 56.

### C. Monday June 25, 1989: Teresa's, Eduardito's, and Melissa's Last Day Alive

Morales claimed that he drove Melissa and Eduardito to his parents' home in his mother's car, a champagne-colored Toyota Corolla, on Friday, June 23, 1989.  (Docket No. 186, Ex. 2 at pp. 67 and 214.)  His blue Toyota Tercel was "in the shop for some repairs." Id. at pp. 215 and 230. The children spent the weekend with their father and grandparents. Id. at p. 67.  Teresa remained at her mother's house in Santurce, Puerto Rico.  Id. at p. 129.  She "didn't like staying at [her own] residence," a "dark" house with poor lighting.  Id. at pp. 68 and 129.

Teresa spent the day before her untimely death surrounded by family, including Agosto. Id. at p. 36. They were "like sisters," "always look[ing] after each other." Id. at p. 38. Teresa, her mother, Agosto, and other relatives attended a religious celebration on Sunday, June 25, 1989. Id. at p. 67. The attendees sang, enjoyed music provided by a church choir, and sunbathed at the beach. Id. at p. 69. Agosto and Teresa each consumed one beer. Id. at p. 130. Eduardito and Melissa did not attend because "[they] were with [Morales]." Id. at p. 67.

At approximately 6:00 p.m., Agosto and Teresa drove to a relative's home in the former's Honda Civic. Id. at p. 69. An hour later, the cousins arrived at Peggy Sue, a disco located at Stop 18 in Santurce, Puerto Rico. Id. at p. 70. For "around fifty minutes," they "sat down on some small benches that were outside [the entrance . . . because they didn't have any money]" to pay the admission fee. Id. at p. 70. Teresa and Agosto then drove to the Trujillo Alto duplex. Id. at p. 71. According to Agosto, they arrived at Teresa's home at 8:45 p.m. Id. At this time, "it was a bit dark," with a single light pole illuminating the sidewalk in front of Teresa's house. Id. at pp. 71-72.

Agosto "left the car running [and] talked to [Teresa] for a little while." Id. at p. 72. Teresa invited her to "come in [for a visit]," but she declined. Id. at p. 72. Agosto

"noticed a couple of people outside, but [she] didn't look at any of them." Id. at p. 73. Bárbara Martinez ("Bárbara"), "a girl who [lived] around there whose [nickname] is Baby . . . came to talk to [Teresa]." Id. Bárbara was a "close friend of [Teresa]," a frequent house guest and companion. Id. at p. 76. Agosto then told Teresa: "I'm leaving, call me tomorrow because I have to go." Id. at p. 77.

When Agosto returned home, she received a phone call from Morales at approximately 9:05 p.m. Id. at p. 78. Morales "asked [Agosto] where [Teresa] was, what [they] had done all day." Id. Agosto refrained from disclosing that she and Teresa "had been to Peggy Sue," because "[she was] afraid of his reaction." Id. at p. 136. Morales informed Agosto that "[he was] heading out [to take] the kids to [Teresa]." Id.

Morales testified that he arrived at Teresa's residence "between 8:00, 8:30, 9:00 in the evening." Id. at p. 213. He observed that Teresa "was outside talking" to Meléndez. Id. at p. 216.[3] He "really didn't pay attention" to the immediate vicinity, however, and could not recall whether "anybody else [was] there." Id. Morales "said good evening [to Meléndez] and proceeded to enter [the house] with [Teresa] and [their]

---

[3] Meléndez lived in the house adjacent to Teresa within the same duplex. (Docket No. 186. Ex. 2 at p. 262.)

children." Id. at p. 217. Teresa, Morales, Eduardito, and Melissa chatted in the living room for "approximately forty-five minutes." Id. at pp. 218-222. Morales "hugged [Eduardito and Melissa] tightly, kissed them, told them to take care of their mom and to behave." Id. at p. 222. He then "went to [his] mother's house," arriving at "around 10:00" at night. Id. at pp. 224 and 232.

**D.    Wednesday June 28, 1989: Neighbors Discover Teresa's Corpse Inside the Upstairs Bathroom**

On June 28, 1989, Teresa's neighbors noticed that a noxious stench emanated from her house, raising concern among them. (Docket No. 186, Ex. 5 at p. 152.) Meléndez's father, Narciso Meléndez-Pérez ("Narciso"), called the Puerto Rico Police Department at "around 9:00 to 9:30" on Wednesday morning to report the odor. Id. at p. 152. Two police officers responded to the scene. (Docket No. 186, Ex. 8 at p. 79.)

Once the two police officers arrived, neighbors Luis Campos-Encarnación ("Campos") and Narciso "jumped over [Teresa's fence]," "open[ing] the gate" for law enforcement. Id. at pp. 77-80. The officers, Campos, and Narciso "looked at the doors," attempting to enter the residence. Id. at p. 81. Narciso "went out to fetch some knives . . . He gave [the knives] to the police so they could try to open the two doors." Id. The officers "were

unable to open either of the doors," however, requiring the removal
of "five window panes" from the kitchen window.  Id. at p. 82.
Campos entered first, followed by the officers and Narciso.  Id.
He then unlocked the front door, requesting that the officers "tell
the prosecutor that [he] touched this door" in an abundance of
caution.  Id. at p. 82.

Campos instructed the officers to follow him upstairs.
Id. at p. 83.  The officers complied, walking behind Campos to the
second floor.  Id.  He discovered Teresa in the bathtub, "[showing
the officers] where the deceased was [located]."  Id. at p. 84.
Campos noted that there "wasn't any blood" on the hallway floor
leading to the bathroom.  Id.  The officers entered Teresa's
bedroom, turning off a TV and fan.  Id.  They then "went outside
[because] the stench was too strong."  Id.

Campos informed the officers that "they were missing two
children and a dog . . . [They] turned around and went back
upstairs.  [The officers] opened the doors to the two [additional]
bedrooms," but "didn't find anything."  Id. at p. 85.  Shortly
after, a "bunch of officers arrived, and everyone started going in
[the house]."  Id.

E.    **Pandemonium at the Crime Scene**

Police Officer Dean Casillas-Feliciano ("Dean") received
a note "indicating that a dead person had been found at Calle 2 in

Lomas de Trujillo Alto." (Docket No. 186, Ex. 2 at p. 265.)[4]
Because Dean "[performed] duties in that same area and it was about
the house where [he] lived," he "talked to the Sergeant to see if
he would let [him] go by the place." Id. at p. 265. Dean arrived
at Teresa's house at approximately 9:00 a.m., where he noticed
several fellow officers from the precinct there and several
onlookers." Id. at pp. 265 and 271. Officers lamented that "it
was not possible to enter the site to see the person because [the]
bad smell emanating from [a] decomposing body, well, was quite
unpleasant." Id. at pp. 265-66.

        Campos discussed the crime scene with Dean, providing
him with a towel saturated "with some Vicks." Id. at p. 266. Dean
placed the towel on his face," and "tried to go upstairs." Id. at
p. 266. He encountered the "decomposing body of a woman in the
bathroom," "sitting, leaning against the wall in the bathtub."
Id. at p. 266. According to Dean, the woman wore a "sweater [that]
was rolled up to [her] breasts, green military shorts [that] were
unbuttoned," and pink underwear. (Docket No. 186, Ex. 2 at p. 269;
Docket No. 186, Ex. 3 at p. 57.) The woman's face was swollen

---

[4] Dean Casillas-Feliciano lived on Calle 2 in Lomas de Trujillo Alto. (Docket
No. 186, Ex. 2 at p. 260.) In 1989, he worked as a Puerto Rico State Police
officer at the North Trujillo Alto Police Station in Covadonga. Id. at p. 261.
Gregorio Casillas ("Gregorio") was also a police officer and lived on this same
street. Id. at p. 262. Dean and Gregorio are not related, but share the same
surname and are both police officers. Id. at 263.

"with the tongue out, semi-bulging eyes." (Docket No. 186, Ex. 3 at p. 11.)  A window above Teresa's body was closed, surrounded by a swarm of flies. (Docket No. 186, Ex. 2 at p. 270.)  The "bathtub was clean," and the "bathroom had no blood." (Docket No. 186, Ex. 3 at pp. 10 and 58.)

Dean returned downstairs, and waited in the kitchen for reinforcements. (Docket No. 186, Ex. 2 at p. 270.)  The kitchen contained "a big refrigerator," stove, and table. (Docket No. 186, Ex. 3 at p. 17.)  The table was a "mess" with items that "were supposed to be in the fridge." Id. at p. 19.

Lieutenant Jorge Rivera ("Rivera"), Prosecutor Carlos Juan Beltrán-Rodríguez ("Beltrán"), and a gaggle of homicide agents arrived an hour after Dean ventured upstairs, at approximately 11:30 a.m. (Docket No. 186, Ex. 2 at p. 270.)[5] Beltrán inspected Teresa's body, observing that she sustained a stab wound in the center of her chest. (Docket No. 186, Ex. 3 at p. 56.)  Dean followed Rivera inside the house and "started checking around the area, [trying] not to touch anything." (Docket No. 186, Ex. 2 at p. 272.)  He "explained to the Lieutenant that two or three officers had entered, and that perhaps, well, they may have touched something [at the scene]." Id. at p. 272.

---

[5] Beltrán and Rivera led the investigation and were the highest-ranking law enforcement officers at the crime scene. (Docket No. 186, Ex. 3 at pp. 58-59.)

Police officers discovered a blood-stained mattress, sheets, and a pillow on the floor of Teresa's bedroom. (Docket No. 186, Ex. 3 at p. 1.) They moved the mattress, pillow and sheets before photographs were taken. Id. at p. 13. "There was a lot of blood on the mattress," but not on the bedroom walls. Id. at p. 5. According to Dean, "quite a bit of blood [appeared] as if [it] had gotten cleaned." Id. at p. 5. The blood that remained at the scene "was already coagulated." Id. at p. 6. The bedroom windows were ajar. Id. at p. 7.

The living room "wasn't in order but it wasn't messy." (Docket No. 186, Ex. 3 at p. 65.) "A Budweiser beer bottle stood on a small table . . . There were bottles on the floor [and] a pack of cigarettes." Id.[6] Police officers also discovered a marijuana cigarette. Id. at p. 78.

Dean notified homicide agents that he heard "rumors" regarding the location of Eduardito and Melissa, speculating that "it may have been the father who committed the crime and [had] taken the kids." Id. at p. 272. Officers once more searched the bedrooms for Eduardito and Melissa. Id. at p. 272.

There were also "people [inside the house] that were not [law enforcement. They were] nosy people." (Docket No. 185, Ex. 3

---

[6] Morales denied that he drank alcoholic beverages during his final visit to Teresa's house. (Docket No. 186, Ex. 2 at p. 245.) He testified, however, that his favorite beer was Budweiser. Id.

at p. 24.)  "Everyone did as they pleased."  Id.  A neighbor searched the house for Teresa's dog while members of the press roamed freely.  Id.  Beltrán "ordered everyone to leave . . . three or four times," but to no avail.  (Docket No. 186, Ex. 3 at pp. 60-61.)  Members of the press, including reporters from Channel 11 and El Vocero newspaper, entered Teresa's home, photographing the victims' bodies at will.  Id. at p. 62.

Rivera entered the kitchen, where he observed a small lamp and items "that were supposed to be in the refrigerator [and] some knives."  (Docket No. 186, Ex. 1 at p. 109.)  Because officers "couldn't see anything" inside the kitchen, [Rivera] requested that a "person from the press [. . .] turn on [a] spotlight so that the guys could process what was on the table."  Id. at p. 126. Rivera held a knife in his hand, but did not examine it closely because "the place was so packed with people from the press and police officers who had nothing to do."  Id. at p. 110.  He learned that officers located additional knives "outside" of the property. Id. at p. 112.  Rivera "didn't order them to be seized," however, because "to [him] they didn't constitute evidence at the time." Id.

Rivera ordered officers at the scene to seize "anything that constituted evidence."  Id. at p. 114.  This testimony suggests that individual officers possessed the discretion to

designate which items were subject to seizure. Rivera also testified that he determined which knives were relevant to the investigation. Id. at p. 123. If he "didn't see any blood [on a knife], [he] didn't see anything that would link the knife to the [victims]," so he "wasn't going to seize the knife." Id. at p. 23. Governing protocol mandated that Rivera review the evidence at police headquarters. Id. at p. 124. Rivera disregarded this protocol. Id. at p. 125. He did, however, excuse himself from the crime scene to speak with reporters in front of Teresa's house. Id. at p. 129.

Beltrán spoke with Dean inside Teresa's kitchen, "trying to piece things together to figure out how the crime [. . .] could have happened." (Docket No. 186, Ex. 3 at pp. 20.) Dean surmised that Teresa "must have been cleaning the refrigerator because the shelves of the refrigerator were outside [on the table]" with some meats and expired milk. Id. at pp. 20 and 22. He also noticed a pair of boys' shorts on the table, stained with blood and beneath a kitchen knife. Id. at pp. 22 and 30.

Beltrán ordered the shorts to be seized. (Docket No. 186, Ex. 3 at p. 69.) According to Dean, "it looked as if [the murderer] had cleaned that same knife with the pants and had left it there." Id. at p. 31. An officer "[took] the knife," however, "[lifted] it from the shorts [and] put it on top of the

[sink] along with [other knives]." Id. at p. 31.  This officer
also moved the bloody shorts.  Id.[7]  Dean refrained from interfering
with this violation of crime scene protocol because of the then
existing "discord between uniformed and non-uniformed police
officers." Id. at p. 31.

    At this juncture, Dean opened the freezer door and
discovered a "frozen girl." Id. at p. 21.  Beltrán "started
running [and] told [Dean] not to touch the fridge." Id. at p. 21.
Dean "told the district attorney, well, look, if the girl is in
the freezer, the boy is a bit bigger, he must be in the bottom
area since the shelves of the fridge are outside." Id. at p. 21.
The exterior of the refrigerator contained no blood.  Id. at p. 22.
Beltrán "went up in a hurry to get Lieutenant Rivera." Id. at
p. 21.

    Rivera subsequently opened the bottom door of the
refrigerator, "seeing the body of the boy." Id. at p. 26.  He
"immediately proceeded to take the boy out from the bottom of the
fridge," placing Eduardito "on the floor in front of the sink."
Id. at p. 26.  Rivera then attempted to remove Melissa, but "the
girl was stuck." Id.  He succeeded in removing her from the
freezer with Dean's assistance.  Id.  Rivera placed Melissa next

---

[7] At trial, Rivera could not recall finding a pair of children pants with blood.
(Docket No. 186, Ex.1 at p. 115.)  The Commonwealth then introduced a photograph
of Rivera holding this article of clothing.  Id. at p. 116.

to Eduardito. Id. "There was blood in both the freezer and bottom area" of the refrigerator. Id. at p. 28. "At a glance," Melissa had no wounds. Id. A layer of ice covered her body, however, preventing officers at the scene from conducting a more thorough inspection. Id. Eduardito "had some perforations . . . in the area of the back." Id.

In sum, Eduardito's and Melissa's bodies were discovered three hours after Dean arrived at Teresa's house. Id. at p. 21. Dean "thought that if [he] hadn't opened the fridge by accident . . . people from the funeral home would have taken the murdered woman and they would not have found the bodies of the children." Id. at pp. 21-22. He "found that there was no control of the scene." Id. at p. 267. "A lot of [uniformed and civilian-clothed] police officers got inside in a disorderly manner [and] they touched and messed a lot with the scene . . . [It] was not protected as it should have been protected." Id.

### F. Investigators Contaminate, Discard, and Destroy Critical Evidence

Beltrán ordered that the responding officers seize Teresa's blood-stained bedsheets for analysis. (Docket No. 186, Ex. 3 at p. 58.) He also ordered them to recover the knives in the kitchen, any of which may have been the murder weapon. Id. at p. 64. In fact, Beltrán witnessed "officers carrying two boxes

containing photo albums [and] things that [he] thought were relevant." Id. at p. 81. These officers informed Beltrán that "everything [had] been collected." Id. at p. 81. "For whatever reason" however, "the investigating officer[s] did not seize [the] knives." Id. at p. 83.

Beltrán and Rivera instructed Officer Frank Figueroa-Álvarez ("Figueroa") to treat the kitchen, living room, windows, and "any material that was polished in that location" for fingerprints. (Docket No. 186, Ex. 3 at p. 27.) He did not attempt to lift fingerprints from the location of Teresa's body, however, in part because "there were many officers there." Id. at p. 128. People were "touching everything and messing up the scene." Id. at p. 238. Only three police officers wore gloves. Id. at p. 239. Figueroa "wasn't able to lift any fragment with value" from Teresa's bedroom either, including from her TV, fan, and dresser. Id. Officers and members of the press who "had no business being [at the scene] . . . got in the way" of Figueroa's work. Id. at p. 236. They were "looking and prying" throughout the house. Id. No fingerprints were lifted from the children's bedrooms. Id. Beltrán ordered that the milk containers and items from inside the refrigerator be tested for fingerprints. (Docket No. 186, Ex. 1 at p. 107.) But, "[no] fingerprints were lifted from those containers." Id.

When Figueroa attempted to treat the downstairs half-bathroom for fingerprints, he "noticed that someone had already washed their hands there and flushed [the toilet]." (Docket No. 186, Ex. 3 at p. 140.) He observed that the water in the toilet appeared "reddish [. . .] like blood." Id. at p. 231.

Figueroa submitted fingerprint impressions from the kitchen and living room. Id. Of the four impressions submitted to the laboratory, only one had "comparative value." Id. at pp. 130-31. Fingerprints from an ashtray located in the living room belonged to Morales. Id. Figueroa advised his commanding officers that the knives in the kitchen should be sent to the laboratory to undergo a "proper [fingerprint] treatment," but his suggestion was rebuffed and ignored. Id. at p. 134.

### G.  Teresa's Family Encountered a Gruesome Crime Scene

Teresa's family convened at the Trujillo Alto residence at approximately 2:30 p.m., in disbelief that the twenty-four-year-old mother and her two children were dead. (Docket No. 186, Ex. 2 at p. 84.) The police "had already left" once they arrived at the scene. Id. at p. 93. "All the neighbors were gathered outside, [and] there were a lot of people [unknown to the family who were] inside the house." Id. at p. 85.

Agosto entered her cousin's home, observing blood in the hallway and "in front of the kitchen door." Id. at p. 86. "All

the things that were inside the fridge" were removed and placed on the kitchen table.  Id.  Agosto proceeded upstairs, observing that Teresa's bedroom "was in the same condition that she had left it," with the exception "that the mattress was covered in blood, the bedsheets were all covered in blood, the TV was on," and the walls "were splattered with blood."  Id. at pp. 86-88.  The mattress contained three distinct "blood stains," one large and two smaller pools of blood on the fabric.  Id. at p. 87.

Agosto then walked to the bathroom.  Id. at p. 90. Teresa's body had been removed, but certain "remains" lingered inside the bathtub "all covered in blood."  Id.  "She had decomposed there [. . .] there were parts of her there [with] maggots."  Id.

Agosto entered Melissa's room, noting that "there was no blood."  Id. at p. 91.  The girl's bedspread was "folded over the mattress . . . [like when] kids hide under the bed."  Id. Eduardito's bedroom appeared untouched and had no visible traces of blood.  Id. at p. 92.  Agosto returned to the downstairs living area, observing "blood draining down the [handrails]."  Id.  She had "the impression that . . . blood had been cleaned from the floors because [she] had seen very little blood on the floors compared to what, what had obviously come out of the bodies."  Id. at p. 170.  The hamper in the laundry room downstairs contained

blood-stained clothes, including underpants belonging to Eduardito
and a sweater.  Id. at p. 92.  Overwhelmed by grief, Agosto "closed
the door," left the unsupervised murder scene, and drove to the
Puerto Rico Institute of Forensic Sciences ("IFS").  Id. at p. 94.
Teresa's father then physically attacked Morales, accusing him of
killing his daughter.  Id. at p. 246.

    **H.  The Causes of Death**

       Forensic  pathologist  Dr.  Lydia  Álvarez  ("Álvarez")
performed the autopsies of Teresa, Eduardito, and Melissa. (Docket
No. 186, Ex. 3 at p. 144.)  Dr. Álvarez did not testify at trial,
however, because she subsequently left the IFS for a position at
the University of Puerto Rico.  Id. at p. 152.  Her successor,
Dr. Ofelia Vera ("Vera"), testified on behalf of the Commonwealth.
Id.

       According  to  Dr.  Álvarez's  report,  Teresa  sustained
three knife wounds to the center of her thorax. (Docket No. 186,
Ex. 3 at p. 155.)  All three wounds "were located in the heart,"
puncturing her chest "from front to back, from right to left, and
from the bottom up."  Id. at pp. 156-57.  These wounds caused
Teresa's death.  Id. at p. 157.

       Teresa sustained defensive wounds on both hands.  Id. at
pp. 160 and 197.  Id.  Her body exhibited signs of decomposition,
including protrusion of her eyeballs, distension of tissue, and

detachment of her skin.  Id. at p. 162.  Her nasal cavity contained
fly larvae.  Id. at p. 163.  Dr. Vera testified that Teresa's body
exhibited a "decomposition of around three days, or over 48 hours."
Id. at. p. 170.  She emphasized that "decomposition is accelerated
with heat."  Id. at p. 171.  Dr. Álvarez recovered pubic hairs
from Teresa's underwear.  Id. at p. 246.  She did not test Teresa's
clothing for the presence of semen.  Id. at p. 212.

Melissa sustained two stab wounds to her back.  (Docket
No. 186. Ex. 2 at p. 177.)  These wounds were four inches deep,
punctured her lungs, but "[would not] have caused death quickly."
Id. at pp. 178-79.  She "could have survived" had a surgeon
performed a lobectomy shortly after infliction of the knife wounds.
Id. at p. 179.  Melissa's body displayed signs of decomposition,
such as "greenish coloration in the abdominal area," "dilatation
of superficial veins," and the presence of fly larvae in her scalp.
Id. at pp. 182-84.

Dr. Vera opined that Melissa's body decomposed for
"about over 40 hours more or less."  Id. at p. 182.  She also
testified, however, that "freezing stops [decomposition]."  Id. at
p. 182.  If the murderer or an accomplice "put [Melissa's body in
[the freezer] immediately" after death, discoloration of the
abdominal area and dilatation of her veins "wouldn't have
occurred."  Id. at p. 183.  Accordingly, Melissa's body was placed

in the freezer approximately 40 hours after her death.  Id. at p. 202.  If Melissa died on Monday morning between 3:00 a.m. and 4:00 a.m., she would have been placed in the freezer "no earlier than noon on Tuesday."  Id. at p. 203.  Thus, the culprit or an accomplice returned to the scene of the crime to place Melissa in the freezer.

Eduardito sustained three stab wounds to his back and shoulders. (Docket No. 183, Ex. 3 at p. 184.)  These wounds penetrated his heart, left lung, and pericardium.  Id. at p. 195.  These injuries were fatal.  Id.  Dr. Vera testified that Melissa and Eduardito were both in the prone position at the time of their death.  Id. at. p. 186.  She also stated that Eduardito "was placed in the refrigerator [. . .] much earlier than [Melissa]," likely "in the first few hours" after his murder.  Id. at p. 205.

Teresa, Eduardito, and Melissa were together during the murders based on the presence of the "mother's hairs [on] the bodies of the children." (Docket No. 186, Ex. 3 at p. 225.)  The children had no defensive wounds.  Id. at p. 198.

### I.   Thursday June 29, 1989: Family Members and the Puerto Rico Department of Health Sanitize the Crime Scene

The Puerto Rico Health Department contacted Teresa's mother after investigators abandoned the crime scene, informing her that "neighbors had complained about the bad smell." (Docket

No. 186, Ex. 2 at p. 96.)  The authorities requested that the decedent's family "open the house" to fumigate the residence.  Id. Agosto and other relatives returned to Teresa's house on June 29, 1989.  Id. at p. 95.  She entered the duplex "like always" by removing slats from the kitchen window.  Id. at p. 96.

Employees from the Health Department "said that they weren't going to fumigate until [the family] cleaned it up." Id. at p. 97.  Teresa's mother objected, stating that it was "impossible for [them] to clean up this house."  Id. at p. 97. She called the Puerto Rico Police Department for guidance.  Id. For reasons beyond this Court's comprehension, investigators stated that "nothing else would be done in the house," and that "it could be cleaned."  Id. at p. 98.  Consequently, Teresa's family cleaned the crime scene.  Id.

They "hosed [Teresa's] room down" with water, "starting from the top" of the walls.  Id.  Initially, her family "didn't' know what to do with the mattress, which was all covered in blood." Id.  They ultimately "[threw] the mattress downstairs in order to burn it."  Id.  A neighbor helped them set this evidence ablaze in the front yard of the duplex.  Id. at p. 99.  Family members also burned "all the things that were covered in blood," including the bedsheets, the pillows, and the kids' clothes."  Id.  Agosto assisted in gathering the children's clothing from "all over the

floor in the laundry room." Id. She also cleaned the refrigerator. Id. at p. 100. The Health Department then fumigated the house for "fifteen or twenty minutes." Id. at p. 101.

**J.    The Murder Weapon Appeared at Morales' House Months After the Murders of Teresa, Eduardito, and Melissa**

Agosto and other relatives returned a week after the triple homicide to "get all of [Teresa's] things out of the house," concerned that "anyone could get [inside] because the gates were broken." Id. at p. 102. Morales' father and brother assisted Teresa's family in this endeavor. Id. at p. 103. They "picked up everything" and disassembled the beds. Id. "Everything [that the family] thought was useless was thrown away." Id. Teresa's personal effects and household goods were placed in cardboard boxes. Id. at p. 104.

Agosto washed the dishes, including an assortment of knives in "different sizes." Id. at p. 105. Morales' father and brother entered the kitchen, "[taking] it upon themselves to handle the heavy stuff." Id. at p. 107. Agosto placed three boxes containing Teresa's belongings in the trunk of her Honda Civic. (Docket No. 186, Ex. 1 at pp. 21 and 45.) The next week, she transferred the boxes to Morales, who then placed the boxes in his car. Id. at p. 21 and 30. Morales transported the boxes to his mother's house, where they remained for approximately five months

because he "couldn't find the courage" to sort through Teresa's belongings.  Id. at p. 22.

According to Colberg (Morales' mother), the boxes were "in [her] house for a few months."  (Docket No. 186, Ex. 5 at p. 24.)  She subsequently organized the boxes, placing "an ugly, broken, dirty knife" in a trash bag.  Id. at p. 25.  For an inexplicable reason, "[she] didn't like that knife and started to get nervous."  Id. at p. 26.  A "sixth sense" compelled Colberg to remove the knife from the trash bag.  Id. at p. 36.  She "decided to look at it more carefully, with a big magnifying glass," observing two hairs where "the blade joins the wooden handle." Id. at p. 26.  Colberg "got scared" because she suspected that the knife "could be [the weapon with which her] two grandchildren and [her] son's wife had been killed."  Id. at p. 26.

She placed the knife inside a plastic bag and showed her son.  Id. at p. 28.  Morales and Colberg concurred that the knife "could have been [the murder weapon]."  Id. at p. 20.  They first consulted an attorney, who advised them to contact the authorities. Id. at p. 30.  A police officer retrieved the knife from Colberg's home.  Id.

Dr. Vera analyzed the knife provided by Morales and his mother.  (Docket No. 186, Ex. 3 at p. 186.)  Technicians at the IFS stabbed a slab of pork meat with the knife to compare the

lacerations with "photographs of the [victims] bodies." Id. at
p. 186.  Dr. Vera "found that there was a lot of similarity." Id.
at p. 186.  She concluded that "this weapon was compatible [. . .]
with what was used in the deaths." Id. at p. 196.  "There is no
doubt" that Melissa and Eduardito were killed with the same weapon.
Id. at p. 197.  Because Teresa's "body had decomposed," Dr. Vera
could not conclude that she was killed with the same knife as her
children.  Id. at p. 197.

        Leida Rodríguez-Vélez ("Rodríguez-Vélez"), a medical
technologist at the IFS, compared Teresa's hair with the hair
embedded in the purported murder weapon.  (Docket No. 189, Ex. 6
at p. 6.)  To conduct this analysis, Rodríguez-Vélez simply
reviewed hair strands "with the naked eye" under a microscope.
Id. at p. 8.  She claimed that the hair contained in the knife
possessed "microscopic characteristics similar to the control hair
of the victim Haydee Teresa Maymí-Rodríguez." Id. at p. 13.

        Agosto did not specify whether she placed the purported
murder weapon inside the boxes she packaged at the Trujillo Alto
duplex, or whether she washed it in Teresa's kitchen sink after
the triple homicide.  (Docket No. 186, Ex. 2 at pp. 106-07.)  She
testified, however, that the knife belonged to Teresa but that
"the tip wasn't broken, nor was it missing so many pieces." Id.
at p. 107.  Morales recognized the knife as belonging to "his

household," "but [that] the blade wasn't broken" before the murders.  (Docket No. 186, Ex. 2 at p. 227.)  Dean testified that the knife submitted by Morales "looks like the knife that was on the table" at the crime scene, but did not recall "seeing it as broken as it was" during the trial.  (Docket No. 186, Ex. 3 at p. 33.)

> **K.   Teresa's Neighbors State that They Heard a Woman Scream in "Anguish" and that a Child Yelled "Don't Hit Me" on the Night of the Murders, but No Suspects Emerge**

Less than a week after the bodies were discovered, Beltrán "was transferred to Caguas to work there as a courtroom district attorney."  (Docket No. 186, Ex. 3 at p. 80.)  Police Officer Pablo Quiñones-Laboy ("Quiñones") joined the investigation in August 1989, terminating Rivera and Police Officer Gerardo Román-Ayala ("Román")'s involvement in the case.  (Docket No. 186, Ex. 3 at pp. 244-45.)

Before transferring to Caguas, Beltrán received information suggesting that Teresa had a "romantic relationship" with a former work colleague nicknamed "Juanma el Prieto."  (Docket No. 186, Ex. 3 at p. 97.)  This man "[tried] to win her heart" by "sending her flowers" and "inviting her out."  Id. Narciso "scolded [Juanma] because he had been honking the horn" late at night, waking the neighbors.  (Docket No. 186, Ex. 4 at

p. 9.)  This confrontation occurred on Saturday June 24, 1989 at "1:00 or 2:00 in the morning."  Id. at p. 148.

Román located and interviewed Juan Manuel Pagán ("Pagán"), also known as "Juanma el Prieto."  Id. at p. 9.  Pagán disclosed that "he previously visited [Teresa] at her residence . . . in Cupey and that he had sex with her about two times."  Id. at p. 150.  He also stated that he "could not have been the murderer" because he was "at his [mother's] residence sleeping with his girlfriend" on June 25, 1989.  Id.  Police officers did not, however, verify Pagán's alibi.  Id. at p. 157.

Meléndez informed investigators that at 10:00 p.m. on June 25, 1989, Teresa "came out yelling [. . .] that there was a man looking at her through the window, in the back area of the house." (Docket No. 186, Ex. 4 at p. 7.)  Teresa was "agitated," and the children "were crying."  Id. at p. 66.  Meléndez "took steps to find out who had been looking at her," and told Teresa that "if something happened during the night, to move to the front bedroom [. . .] and to knock on the wall [so] his mother would be able to hear her."  Id. at pp. 7 and 61.  Gregorio Casillas and

his wife witnessed Teresa's reaction to the voyeur, corroborating Meléndez's statement.  (Docket No. 186 Ex. 4 at p. 65.)[8]

Quiñones testified that he "spent two years looking for [the peeping tom]," but never found him.  Id. at p. 76.  He also met with Román to "see what he had investigated."  Id. at p. 245. Quiñones quickly assessed that "there wasn't much physical evidence recovered."  Id. at p. 246.  Quiñones presumed that officers "worked on [the crime scene] inch by inch [to establish a] solid foundation from the beginning."  Id.  This "solid foundation" was, in fact, nothing more than an anemic inventory of evidence.  The police gathered the following objects from the crime scene:  "some photography albums of the family" and a clay mug. (Docket No. 186, Ex. 3 at p. 346; Docket No. 186, Ex. 4 at p. 1.) "No knives had been seized."  Id. at p. 4.

Ramonita Rivera-Colón ("Rivera-Colón") lived next door to Teresa.  (Docket No. 186, Ex. 5 at pp. 127-31.)  At 4:00 a.m. on Monday, June 27, 1989, Rivera-Colón heard a woman screaming "in anguish."  Id. at p. 133.  She "went to the middle room [of her

_____

[8] Steve Jiménez-García ("Jiménez") lived on Calle 2 in Trujillo Alto.  (Docket No. 186, Ex. 9 at p. 7.)  On June 25, 1989, Jiménez heard Teresa scream at "around 10:40 at night" from his bedroom.  Id. at p. 8.  She yelled "help, help . . . Ms. Lucy and Juan Carlos, there is a man watching me."  Id. at p. 9. Jiménez's wife also heard Teresa's scream.  Id.  On Monday morning, June 26, 1989, Jiménez witnessed Teresa "entering her house" at "7:30 AM in the morning." Id. at p. 10.  Jiménez contacted the police "about a month" after the murders, detailing the scream heard on Sunday night and the Monday morning sighting of Teresa: Investigators never interviewed him.  Id. at pp. 25 and 29.

duplex,] turned on the light and looked through the window" toward Teresa's house.  Id. at p. 135.  She then heard "a child crying and saying, 'don't hit me, don't hit me.'"  Id. at p. 136.  Rivera-Colón dismissed this commotion, however, because "those kids" were "in the habit of waking up at 4:00 in the morning screaming [and] thought [Teresa] was scolding [them]."  Id.  She looked out her front window, but "there was nobody" outside.  Id. at p. 137. After "about ten or fifteen minutes," Rivera-Colón "went back [to bed]."  Id. at p. 138.

Román informed Quiñones that a witness "[said] she had seen a purse on the roof of [Teresa's] house."  (Docket No. 186, Ex. 4 at p. 1.)  Quiñones borrowed a ladder from the fire department to retrieve the purse.  Id.  The trial transcripts do not indicate whether the purse contained any of Teresa's belongings.

Quiñones searched a warehouse maintained by the IFS in vain, perusing evidence "box by box, trying to find [. . .] the [bed]sheets that could be seen in the [crime scene] video and photos."  Id. at p. 2.  He could only locate Teresa's pants, her shirt, and children's clothing with loose strands of hair.  Id. Subsequently, Quiñones requested that the Department of Justice exhume the victims' bodies to collect hair samples.  Id.[9]  The

---

[9] The record does not reflect whether Dr. Álvarez collected hair samples during the autopsies, which may have obviated the need to exhume the bodies.

Department of Justice approved this request, exhuming Teresa, Eduardito, and Melissa from their gravesites in Bayamón, Puerto Rico to gather hair samples for comparison. Id. at p. 3.

Quiñones first claimed that he read Román's notes "when [he] took over the investigation." Id. at p. 124. He then explained, however, that he "did not take into account what Román did" during his preliminary investigation. Id. at p. 129. Quiñones admitted that he did not, in fact, read Román's investigative notes to determine if witnesses "repeated the same version or gave him the same information." Id. at p. 164. Indeed, Quiñones "did not take [Román's notes] into consideration at any point." Id. at p. 166. By December 1989, investigators "still didn't have a suspect and [. . .] were interviewing [the] people who lived around the place of the events." (Docket No. 186, Ex. 5 at pp. 6-7).

**L.    Two Eyewitnesses Recant Their Initial Statements to Police, Asserting that Ramos and Meléndez Attempted to Sexually Assault Teresa**

Siblings José "Joíto" Martínez ("José") and Bárbara "Baby" Martínez ("Bárbara") adduced pivotal testimony at trial. In 1989, José and Bárbara were 17 and 15 years old, respectively. (Docket No. 186, Ex. 6 at pp. 76-80.)

Bárbara befriended Teresa on the day that "[the latter] moved to Lomas de Trujillo Alto." (Docket No. 186, Ex. 6 at

p. 252.)   They subsequently formed a "good, sound friendship."
Id. at p. 216.   Indeed, Teresa was "like a sister" to Bárbara.
(Docket No. 186, Ex. 7 at p. 36.)   Bárbara, José, and Meléndez
visited Teresa's house "several times."   (Docket No. 186, Ex. 6 at
p. 216.)   Bárbara and José "always [did] favors" for Teresa,
including help with moving furniture.   Id. at p. 79.   Teresa "even
left her kids" at the sibling's home on occasion.   Id.

    Initially, José and Bárbara denied having any knowledge
of the murders.   Id. at p. 122.   In a television interview with
Channel 11, Bárbara stated that she "had been with the deceased
until 10:30 PM, had left, and knew nothing else about the case."
Id. at pp. 249-50.   Quiñones and Rodríguez nevertheless interviewed
Bárbara "countless times."   (Docket No. 186, Ex. 4 at p. 215.)
Bárbara signed a sworn statement "every time" she spoke with
Rodríguez.   (Docket No. 186, Ex. 6 at p. 252.)[10]

    "Despite [Bárbara] telling [the] investigators [that
she] did not know anything about the case, they would come and
[get] her at [her] house" and at school.   Id. at p. 2.   Bárbara
requested assistance from the Legal Aid Office in Carolina, Puerto
Rico.   Id. at p. 5.

---

[10] Rodríguez testified that he interviewed Bárbara "about two or three additional
times."   (Docket No. 186, Ex. 7 at p. 66.)   In contrast to Bárbara's testimony,
Rodriguez claimed that he "only recorded the August 1989 interview."   Id. at
p. 68.

On December 15, 1990, Bárbara "completely changed [her] version of the facts." Id. at p. 6. The day before, police officers escorted Bárbara and her mother to the Department of Justice at 10:00 a.m. Id. at p. 7. Bárbara repeated the "same thing," reiterating that she "did not know anything about the case." Id. at p. 8. The interview continued for nine hours, however, until Bárbara's account of that fateful night diverged from her previous statements to police. Id. It was around "10:00 at night" that she "started spilling the truth, because [Rodríguez] had called [her] brother [José]. . . and at that point [she] was afraid." Id. After "hours of being at the Justice Department," Bárbara felt "exhausted," "nervous," and "afraid." Id. at p. 9. Rodríguez Mirandized Bárbara, suggesting that the police intended to charge her with a criminal offense. Id. at p. 40. Bárbara then signed a sworn statement at approximately 1:30 a.m. on December 15, 1990. Id. at p. 123.

José experienced an identical epiphany. He arrived at the Department of Justice on December 14, 1990 at 3:00 p.m. to meet with Rodríguez. Id. José signed a sworn statement nearly 11 hours later at 1:30 a.m. on December 15, 1990. Id. at p. 123. Before signing his statement, police officers read José his Miranda rights, informing him that he was "suspected of a crime." Id. at p. 126. Rodríguez interviewed José with Bárbara in the room, a

decision that would have permitted the siblings to coordinate the submission of consistent statements. Id. at p. 123. The following narratives summarize José and Bárbara's trial testimony.

### 1. Bárbara's Trial Testimony

According to Bárbara, Teresa and Agosto arrived at the Trujillo Alto residence at 7:00 p.m. on Sunday June 25, 1989. (Docket No. 186, Ex. 6 at p. 219.) Bárbara testified that she greeted Teresa, then "went inside the house with her." Id. at p. 220. Teresa requested that Bárbara "accompany [her] to buy bread and milk" at a bakery located fifteen minutes away from the duplex. Id.

Once they returned from the bakery, Bárbara alleged that Teresa "asked [her] to accompany her to make a telephone call to a so-called 'Prieto.'" Id. at p. 221. Teresa and Bárbara walked to a payphone, called Prieto, but he didn't answer. Id. After, they went "back to [Teresa's] house," where Bárbara "stood at the [bathroom] door" while Teresa took a shower. Id. at p. 222. Bárbara could not, however, recall the topic of their conversation that night. Id.

Bárbara walked home because her mother "asked [her] to buy cigarettes." Id. The then fifteen-year old "went to the store" to purchase the requested item. Id. Instead of delivering the cigarettes to her mother, Bárbara "saw [Meléndez] talking to

[Teresa, and] stayed with them." Id. at p. 223. "A little while later, [Teresa's] husband arrived" with the children. Id. at p. 225. Meléndez allegedly crossed the street to speak with Ramos. Id. at p. 226. Bárbara then "crossed over to where [Ramos] and [Meléndez] were." Id. Morales, Teresa, and their children entered the duplex. Id. at p. 227.[11]

Bárbara maintained that Meléndez "asked [her] to take [Teresa's house] keys" to have "an excuse to talk to her." Id. at p. 227. She also testified, however, that Meléndez frequently visited Teresa at her home for social gatherings. Id. at p. 216. The trial transcripts do not reveal why Meléndez required an "excuse" to speak with Teresa. Bárbara agreed to steal from her "close friend," a woman she embraced as a "sister." Id.

Bárbara "went up to [Teresa's] house for a moment [and] took the keys." Id. at p. 228. Neither Morales, Teresa, nor the children observed Bárbara enter or exit the house. Id. at p. 230. She then "went to where [Ramos] and [Meléndez] were and stayed with them." Id. Bárbara did not, however, transfer the keys to Meléndez. Id. at p. 228.

---

[11] Rodríguez and Quiñones interviewed Bárbara on August 28, 1989. (Docket No. 186, Ex. 7 at p. 27.) She informed them that her mother "called [her] at 10:30 at night." Id. at p. 28. In fact, Barbara's mother confirmed that she called Barbara at this time. Id. At trial, Barbara testified that she "was lying," however, and that her mother "was mistaken." Id.

"A little while later, [Teresa's] husband left."
Id. at p. 230.  Bárbara returned to Teresa's house and "stayed
talking to [her] at the gate."  Id. at p. 230.  Ramos and Meléndez
remained under a light pole across the street.  Id. at p. 231.
Teenage boys from the neighborhood (José, Armando, Gaby and Luis)
joined Ramos and Meléndez.  Id. at p. 231.  Armando and José walked
across the street to chat with Bárbara and Teresa.  Id.  Teresa
"[told them] that she was at a dance club [and] that she drank a
lot."[12]

"Everyone left" the vicinity except for Ramos,
Meléndez, Bárbara, and Teresa.  (Docket No. 186, Ex. 6 at p. 232.)
Bárbara testified that she "stayed talking to [Teresa] alone" on
the sidewalk.  Id. at p. 233.  Ramos and Meléndez "were still at
the light pole."  Id.  Teresa's children remained inside the house.
Id.  "At around 2:00 to 2:30 in the morning, [José] came out to
get [Bárbara]."  Id.  In sum, Bárbara remained in front of Teresa's
house for 3.5 hours while Ramos and Meléndez congregated near the
adjacent light pole.

---

[12] Bárbara contradicted Agosto's testimony in at least two respects.  First,
Agosto testified that she and Teresa arrived at the Trujillo Alto duplex at
8:45 p.m. (Docket No. 186, Ex. 2 at p. 71.)  Bárbara asserted that Teresa
arrived at 7:00 p.m., affording ample time for them to visit the bakery, walk
to a payphone, and for Teresa to shower all before Morales arrived with the
children.  Second, Agosto testified that Teresa consumed just "one beer."  Id.
at p. 130.  Teresa purportedly informed Bárbara, however, that "she drank a
lot" that day.  (Docket No. 186, Ex. 6 at p. 231.)

Bárbara returned home with Teresa's keys, but
Ramos, Meléndez, José, and Teresa remained on the street.  Id. at
p. 235.  Bárbara went to bed, but "a little while later [her]
brother came to get [Teresa's] keys" and left.  Id.  She "stayed
curious about what the three of them were doing alone with [Teresa]
at the house," somehow cognizant that Ramos, Meléndez, and José
were still with Teresa even after Bárbara she left the area.  Id.
Bárbara could not recall "how much time transpired from when she
left to [her house] until [José] went to pick up the keys."  Id.
She left her bedroom, "went up to [Teresa's] house, went inside
through the kitchen, and [went] upstairs right up against the wall,
up to the last step."  Id.  Again, Bárbara was "curious . . .
because there were three men and only one woman, and she was
alone."  Id. at p. 236.  The record does not reflect whether
Bárbara witnessed the three men enter Teresa's house, or how
Bárbara learned that Ramos and Meléndez were inside the residence.
She somehow knew, however, that three men were inside her friend's
home, a circumstance that sparked her curiosity.  Id.

At the top of the stairs, Bárbara witnessed
Meléndez "hitting [Teresa]" while "[Ramos leaned] against the door
frame." (Docket No. 186. Ex. 6 at p. 237.)  In fact, Meléndez and
Teresa "were hitting one another . . . both of them . . . You know,
he would hit her and she would strike back."  Id. at p. 239.

Bárbara could not recall "where the children were at the time [she] saw [Meléndez] hitting Ms. Teresa." Id. at p. 244. She then fled after "several seconds." (Docket No. 186, Ex. 6 at p. 240; Docket No. 186, Ex. 7 at p. 11.)[13] According to Bárbara, Teresa "was not screaming" during the assault. (Docket No. 186, Ex. 7 at p. 7.) In fact, Bárbara "didn't hear [Teresa]" at all, despite participating in a physical altercation. Id.

Bárbara did not intervene or "tell [Meléndez] not to continue hitting her." (Docket No. 186, Ex. 7 at p. 10.) "While coming down the stairs [she] saw [her] brother with his back turned to the staircase, [she] grabbed him by his left arm and told him . . . 'Let's go, Joíto; this doesn't involve us.'" (Docket No. 186, Ex. 6 at pp. 240-41.) Once Bárbara returned home, she "slept very well." (Docket No. 186, Ex. 7 at p. 32.)

The morning after the purported assault, Ramos allegedly "told [her] to find out if [Teresa] was [at home]. [She] went up to [Teresa's] house, looked inside, [but] the windows were closed. [Bárbara] went down and told [Ramos] that [Teresa] was not there." Id. at p. 241. The following day, Bárbara again "ran into Ramos," who asked her "to find out if [Teresa was home]." Id. at p. 242. Bárbara "went to [Teresa's] house [. . .] but she

---

[13] During cross-examination, Bárbara testified that she only "peered in for a few seconds and left." (Docket No. 186, Ex. 7 at p. 35.)

was not there." Id. She inferred that Teresa was not home "because the windows were closed." Id.

Bárbara refrained from entering Teresa's house in stark contrast to her behavior the day before. She barged into Teresa's house twice to steal the keys and to satisfy her "curiosity" regarding the presence of three men inside her "friend's" home. She would not, however, enter the house to confirm whether Teresa or the children required assistance after the physical altercation with Meléndez. Bárbara subsequently learned that "they had found [Teresa] dead." Id. at p. 243. She "didn't see Meléndez again." Id.[14]

During cross-examination, Bárbara insisted that she "did not lie, [she] omitted" information because her brother "was one of the three who had stayed there with [Teresa] that night." Id. at p. 247. In a sworn statement, Bárbara averred that she had known Ramos for three years and that she was his "girlfriend." (Docket No. 186, Ex. 7 at p. 56.) At trial, Barbara testified that "as far as [she] understood, [she] was" in a romantic relationship with Ramos. Id. at p. 57. She then conceded, however, that this belief was incorrect. Id. at p. 56.

_____

[14] José testified, however, that he ended his friendship with Meléndez because of a dispute with Bárbara regarding videotapes. (Docket No. 186, Ex. 6 at p. 187.) Consequently, José's testimony suggests that Bárbara did, in fact, "see" Meléndez after the triple homicide.

### 2.    José's Trial Testimony

José played basketball with "guys" from the neighborhood on June 25, 1989. (Docket No. 186, Ex. 6 at p. 84.) He left the basketball court at approximately 10:00 p.m. to meet his sister and Teresa in front of the latter's house. Id. According to José, Meléndez, Ramos, "Fredito," "Gaby," "Armando,' and "Otto" were also present. Id. Everyone "stayed talking for a while" on the sidewalk. Id.

José and the other teenagers "were interested in watching" a championship basketball game at 10:30 p.m. Id. at p. 86. Armando, Gaby, José, and Fredito then left the sidewalk, returning to their respective homes to watch the game. Id. José testified that Bárbara, Teresa, Ramos, and Meléndez "stayed in front of the house, having a conversation." Id. at p. 87.

After José watched the basketball game, his mother "told [him] to go get [his] sister" from Teresa's house at "1:00 or 1:30 AM." Id. at p. 90. According to José, Meléndez and Ramos were near a light pole in front of Teresa's house. Id. He testified that at this time "there weren't any people on the street. Everything was shut off." Id.

José called Bárbara's name from the street, alerting his sister that "Mom is calling you to go home." Id. Bárbara "came out of [Teresa's house]." Id. She walked home by

herself in the dark while José remained on the sidewalk with
Meléndez and Ramos "[making] small talk." Id. at pp. 91-92. They
then "started talking about Teresa," and how "she was really hot."
Id. at p. 92.

José testified that Meléndez "[joked] about how to
get with [Teresa] and to put it in her." Id. He laughed "since
[they] were joking" and "didn't take it seriously." Id. at p. 93.
They also talked "[about] how to get inside the house." Id.
Perhaps they would manufacture "some excuse" to gain access. Id.
at p. 94. At approximately 2:30 a.m., "Teresa came outside" and
called José's name. Id. at pp. 94-95. Teresa allegedly requested
José to "get [his] sister" because Bárbara "took [her] keys." Id.
at p. 95. José returned home, telling Bárbara "Baby, give me the
keys, Teresa is asking [for them]." Id. Bárbara handed Teresa's
keys to José. Id.

José returned to Teresa's house. Id. at p. 96. He
greeted Teresa "in the front of [her] house" and "gave her the
keys." Id.[15] José observed that Meléndez and Ramos were still
"at the light pole." Id. at p. 97. Meléndez and Ramos then walked

---

[15] At trial, Bárbara alleged that "no one" knew who seized Teresa's keys. (Docket
No. 187, Ex. 7 at p. 1.) Defense counsel questioned, "[how] was it possible
[then] that your brother went to your house and told you, 'Give me the keys,
[Teresa] sent for them?'" Id. Bárbara hypothesized that "maybe [Teresa]
noticed the keys were not there and . . . since I was always the one who was
always there, sometimes I had her keys." Id.

to José and Teresa to ask for some water.  Id.  José heard "one of them" say that "this is the opportunity . . . to deal with her." Id.  José said, "No, no, no, I am not going to be doing that; I am not going to be in the plot."  Id.  Meléndez insulted José, stating "You sissy; fuck off."  Id.  José "ignored them and left."  Id. at pp. 97 and 114.[16]  He returned home, leaving Teresa alone in the dark of night with two men lingering outside her home, plotting to do her harm.  Id.

When José returned home, "he [thought] about what [Meléndez and Ramos] told [him], although since [he] was getting to know them, [he] didn't think they were going to do something like that, but either way [he] left [his] house and" returned to Teresa's duplex.  Id. at p. 98.  José "didn't find them outside" on the street.  Id.  He entered Teresa's house.  Id. at p. 100. "[There] was no light on the ground floor . . . At that time [José] went up" the stairs.  Id. at p. 99.  José testified that he observed Ramos "leaning against the wall" next to Teresa's bedroom.  Id. at p. 100.  He heard "some voices" that may have belonged to Meléndez and Teresa.  Id. at p. 104.  Teresa allegedly told Meléndez "Juan Carlos, go, it's late; we can talk later if you want."  Id.  But, Meléndez "didn't want to budge; he wanted to talk about another

---

[16] During cross-examination, José stated that he spoke with Meléndez and Ramos for twenty minutes after returning the stolen keys to Teresa.  (Docket No. 186, Ex. 6 at p. 146.)

issue, which, which wasn't even important to him, but the voices became agitated." Id. The voices "would get louder, softer . . . [at one point] they were very loud . . . arguing."

José then went downstairs, sat on the living room sofa, and "[tried] to better understand . . . why [Ramos and Meléndez] were there [. . .] arguing," as if they had not made their intentions known earlier that night. Id. at p. 105. As José was "thinking about why they were arguing," Teresa remained upstairs and outnumbered by two men. Id. José sat still for no "more than ten minutes" in the living room as Teresa fended for herself.

"At one point in time [Bárbara] showed up." Id. at p. 1-7. She "grabbed [José] by [his] left arm and told [him], 'let's go [. . .] I don't like what's going on here.'" Id. Bárbara and José departed from Teresa's house at "about 3:30 to 4:00 AM." Id. at p. 107.

José "did not intervene" because he was "afraid" to defend Teresa. Id. at p. 173.[17] He assumed that Ramos and Meléndez planned "only to rape [her]." Id. at p. 192. His "attitude would not be the same" had he known that they intended to murder Teresa

---

[17] José testified that he once "hit [his] stepfather with a pipe" to defend his mother. (Docket No. 186. Ex. 6 at p. 175.) José mustered the "courage" to protect his mother, but not Teresa on the night of her murder. Id.

Civil No. 20-1589 (FAB)                                            44

and her children.  <u>Id.</u>  José earnestly believed that they "were there only to have a good time with her."  <u>Id.</u>

He "decided to look over at [Teresa's] house [on Monday], but the windows were half-opened, and everything was closed."  <u>Id.</u> at pp. 108-09.  José also encountered Meléndez, and asked "whether he had seen [Teresa]."  <u>Id.</u> at p. 110.  Meléndez allegedly answered, "Oh, well, then she must have left with the kids."  <u>Id.</u>  On Tuesday, Ramos told José that "he didn't know anything either."  <u>Id.</u>

José "continued [his] friendship with [Meléndez] for some time after" Teresa, Eduardito, and Melissa were murdered.  <u>Id.</u> at p. 171.  The plot to sexually assault Teresa and the triple homicide did not deter José from continuing his friendship with Meléndez.  A subsequent "problem with [Bárbara] regarding some videotapes," however, "broke" José's friendship with [him]."  <u>Id.</u> at p. 187.

## M. Investigators Test for the Presence of Semen Years After the Murders

The chain of custody regarding Teresa's underwear is fraught with ambiguity and a lack of documentation.  Beltrán testified that he discovered Teresa inside the upstairs bathtub, "wearing pink panties."  (Docket No. 186, Ex. 3 at p. 57.) Pathologist Dr. Ofelia Vera asserted that "hairs were taken from

[Teresa's] panties," establishing that the IFS assumed custody of this evidence.  (Docket No. 186, Ex. 3 at p. 221.)  Defense counsel questioned Dr. Vera whether "as far as [she knew], in this pathological test performed on [Teresa], did they look for semen?" Id. at p. 212.  Dr. Vera answered, "No."  Id.  Accordingly, pathologists completed Teresa's autopsy without testing for the presence of semen on her clothing.

The IFS only tested Teresa's underwear for semen on March 21, 1991, two years after the triple homicide and three months after the Martínez siblings had implicated José and Meléndez in the murders.  (Docket No. 186. Ex. 6 at p. 20.)  Medical technologist Leida Rodríguez-Vélez testified that the IFS received Teresa's underwear from "Officer Pablo Quiñones" on March 21, 1991. Id. at p. 21.  When asked if she "[knew] where [the underwear] came from," Rodríguez-Vélez answered "No."  Id. at p. 20.  Why would Quiñones submit Teresa's underwear to the IFS if pathologists received this evidence after the murders? For reasons not apparent in the trial transcripts, Quiñones assumed custody of Teresa's underwear at some point after the autopsies, or retained possession of this evidence from the inception of his investigation.

Rodríguez-Vélez had no knowledge of the conditions in which Quiñones stored this evidence.  Id.  She testified, however, that biological fluid such as semen must be preserved in a "low

temperature" and "dry environment" because "moisture and heat" destroy biological fluid.  Id.  According to Rodríguez-Vélez, there "was an absence of semen" on Teresa's shorts, underwear, and sweater.  Id. at p. 18.

**N.  Meléndez's Coworker Testified on Behalf of the Commonwealth**

Meléndez worked with Juan Enrique Ferreiro-Flores ("Ferreiro") at Island Security.  (Docket No. 186, Ex. 5 at p. 41.) According to Ferreiro, Meléndez arrived to work on Monday, June 26, 1989 from "10:00 to 10:30 in the morning."  Id. at p. 52.  Ferreiro signed-in for Meléndez at 6:00 a.m., however, "to cover for him." Id. at p. 53.

Ferreiro testified that Meléndez showed him a newspaper shortly after the triple homicide, stating "look, this happened next to my house."  Id. at p. 43.  Meléndez mentioned that he and Teresa had "some kind of friendship," and that he would visit her house.  Id.  He also informed Ferreiro that investigators "might find [his] fingerprints there . . . because [he] used to sit at [Teresa's] table."  Id. at p. 44.  Meléndez appeared "very worried."  Id. at p. 46.

Ferreiro observed a scratch on Meléndez's neck and chest area "four or five days" after the murders.  Id. at pp. 46-48.  He fabricated a news report, notifying Meléndez that the authorities

were "going to investigate" the skin under Teresa's nails "to see how [Meléndez] reacted." Id. Meléndez responded that he "hadn't watched the news," but appeared "a bit scared" to Ferreiro. Id. at p. 50.[18]

**O. Ramos Raised an Alibi Defense at Trial**

Ramos mounted an alibi defense, contending that he "was at his residence [at the time of the murders]; therefore, he could not have been at [Teresa's] residence." (Docket No. 186, Ex. 7 at p. 32.) His aunt, Margarita Cruz ("Cruz"), testified that Ramos arrived home "from 9:30 to 10:00 at night" on June 25, 1989. Id. at p. 37. She observed Ramos asleep in his room Monday at "around 3:00 in the morning." Id. at p. 38. Cruz had a "habit of waking up at that time [to check] on [her son who] suffered from seizures." Id.

Cruz also alleged that Eduardito and Melissa visited her house between 9:00 and 9:30 p.m. on June 25, 1989. Id. at p. 56. Teresa's children "play[ed] with [her] nephews." Id. at p. 57. At "around 10:00 [at night] . . . they left, because their mom called them." Id.

---

[18] Rodríguez rested on behalf on the Commonwealth on February 20, 1990. (Docket No. 186, Ex. 7 at p. 176.) The Court denied Ramos' motion for summary dismissal, holding that "the evidence that the prosecutor has provided, if the Jury were to believe it, would tend to show that the presence of the defendants in the deceased's bedroom was directed at consummating the result of the conspiracy, which was consummating the carnal act with the deceased." Id. at p. 13.

**P.    Eyewitness    Testimony    Identified    Morales    as    an  
Alternative Suspect**

Damaris García-Ramos ("García") lived near Teresa on Calle 2 in Trujillo Alto. (Docket No. 186, Ex. 8 at p. 124.) She returned home on June 25, 1989 at 11:00 p.m. Id. at p. 125. García observed Morales' car parked near her home. Id. The blue Toyota Tercel had a "dent in the front." Id.[19] According to García, she was familiar with Morales' car and had seen it "several times." Id. During cross-examination, Rodríguez elicited testimony revealing that Ramos' "dad is a cousin of [García's] grandfather." Id. at p. 135. García stated, however, that she did not "have a deep friendship" with Ramos. Id.

Eluzmindrina Feliciano-González ("Feliciano") lived next door to Teresa. (Docket No. 186, Ex. 8 at p. 145.)[20] On Tuesday, June 27, 1989 (the day before neighbors and police discovered the bodies), Feliciano chatted with Bárbara and José's mother "in front of [her] house on the sidewalk." Id. at p. 148.

---

[19] Frank Álvarez-Navaro ("Álvarez") operated a mechanic shop in Villas Palmeras, Puerto Rico. (Docket No. 186, Ex. 7 at p. 105.) Álvarez knew Morales "as a client" for "over 20 years." Id. In fact, throughout the years Álvarez also repaired cars belonging to Morales' father and grandfather. Id. at p. 109. When Álvarez "read the news about the problem with the children," Morales' blue Toyota Tercel "had been inside [his] place of business for about a week or longer." Id. at p. 107. "About a week after" the murders, Morales' brother retrieved the car from his shop. Id. at p. 108. Álvarez did not maintain "any written evidence" or logbook regarding Morales' car, and could not specify the "exact date[s]" he performed the repairs. Id. at p. 109.

[20] Feliciano is also Dean Casillas' mother. (Docket No. 186, Ex. 8 at p. 145.)

At approximately 6:00 p.m. when it was "still daylight," Feliciano
"looked up and [saw] that from the deceased's house, someone jumped
over the gate to the street, to the sidewalk . . . When [she] saw
that individual jump, [he] went and opened [their car door], [she]
saw the [person's] profile." Id. at p. 150.  Feliciano implored
her neighbor, "look, that man, look at what I'm seeing jumping
over [Teresa's] fence." Id.  She inferred that the man "[had] to
be the young woman's husband, because [she had] been told that he
[was] always arguing with her, as they are separated." Id.  The
man entered a blue car, "turned upward and went in reverse and
left." Id. at p. 151.  The car "was dented on the front driver's
side." Id.

        The next day, Feliciano informed her son that she
witnessed an "individual jump over the fence and all that, but
that [she] didn't know who it was." Id. at p. 153.  Beltrán
subsequently interviewed Feliciano in front of Teresa's house.
Id.  Feliciano again "[provided] all the details of the individual
[she] saw jumping" from Teresa's property. Id. at p 154.
Investigators later informed Feliciano that they located Morales'
vehicle, and inquired whether she "could go identify the car."

Id. at p. 155.  Investigators did not, however, "do anything else"
regarding identification of the vehicle.  Id.[21]

At a preliminary hearing regarding the reduction of
bail, Feliciano and other witnesses gathered at the courthouse.
Id. at p. 156.  As she left court, Feliciano "saw the individual
[who jumped over Teresa's fence]."  Id. at p. 157.  That individual
was Morales.  Id.

The jury visited "the Lomas de Trujillo Alto
subdivision" to view the location where Feliciano allegedly
witnessed Morales jump over Teresa's fence.  (Docket No. 186,
Ex. 10 at p. 149.)  The Court and the parties "[used] three
different people [to] jump the fence . . . simulating part of the
testimony of Ms. Eluzmindrina Feliciano and, to such effect, [they]
located a person from the neighborhood and [used] two of the
bailiffs [. . .] who worked at some point with the ladies and
gentlemen of the jury."  (Docket No. 186, Ex. 11 at p. 8.)

**Q.  Closing Arguments**

Although no physical evidence established that Teresa
experienced a sexual assault, rape as the motive for murder
permeated the trial.  José's testimony was unequivocal:  Ramos and

---

[21] Feliciano testified that she observed this incident from a distance of "ten
residences" for a total of five seconds.  (Docket No. 196, Ex. 9 at pp. 78 and
93.)  She persisted, however, that Morales was "identical" to the man who she
observed jumping over Teresa's fence.  Id. at p. 127.

Meléndez intended to "get with [Teresa] and put it in her."
(Docket No. 186, Ex. 6 at p. 92.)  The prosecution and defense
counsel addressed the rape allegations in their final summations.
Excerpts of the closing arguments are set forth below.

Rodriguez's Closing Argument:

> Ladies and gentlemen of the jury, two young people
> appeared here, Barbara was 14 years old at the time, and
> they told you about an event that will never be erased
> from their lives, an event that, in Barbara's own words,
> "Let's go away from here, Joito," referring to her
> brother, "I don't like what's happening." An event that
> demonstrates the participation of these two men, who,
> taking advantage of the small house, planned, "Let's
> have sexual intercourse with her," because she was a
> pretty woman, she was an attractive woman, as her husband
> said, she was a real woman, I like her.    The
> irrepressible desire to have sexual intercourse with
> that woman caused her death and it caused her death
> because she defended her honor [. . .] she did not give
> in to the intentions of these two men [. . . ] The final
> outcome is Teresa's refusal to not let herself be raped
> and she marked it for Juan Carlos' posterity [. . .] .
> I'm telling you, ladies and gentlemen of the jury, that
> the evidence presented here before you by the state, the
> prosecution, without a doubt, establishes a plan for the
> conspiracy to have sexual intercourse with Teresa, Juan
> Carlos' participation, Antonio's participation in the
> vile murder of them committed against two children and
> a woman and to later start to spin a series of lies.

(Docket No. 186, Ex. 11 at pp. 9-20.)  Alvarado's Closing Argument:

> A mirage has been created here, an illusion, a lie, a
> big lie, and what's that big illusion and big lie? That
> these young men went in there to have a good time, to
> rape this young woman, and why say that?  First, they
> insinuated it and, later, they said it. Why? An analysis
> easily establishes that there's the only thing they
> could invent, because she wasn't rich, she didn't have
> jewelry, she didn't have anything, and you have to invent

a motive for the murder, this, the motive of having
sexual intercourse, raping her.  But, what does the
evidence there, they physical, concrete evidence there,
and the scientific evidence of the pathologist say to
us, once again, what does it say, once again, to you,
ladies of gentlemen of the jury?  You saw the photo, you
saw the tapes, Ms. Haydee Teresa Maymi was completely
dressed, she had her clothing, she had her underwear, it
wasn't torn, it wasn't destroyed, where's the attempt,
where's the rape?  Furthermore, her body was examined,
her clothing, excuse me, and semen was found there and
a test was not done to determine if there was semen in
her body, God knows why.  But all the physical and
scientific signs indicate that that woman wasn't
attacked, with the intention of raping her.

(Docket No. 186. Ex 11 at pp. 34-35.)

## II.  The 1992 Guilty Verdict and Post-Conviction Litigation

The jury returned a guilty verdict on April 10, 1992.  (Docket
No. 39 at p. 13.)  Ramos is currently serving the first of three
consecutive ninety-nine year terms of imprisonment for the murders
of Teresa, Eduardito, and Melissa.  See Ramos-Cruz, CR-93-43 (P.R.
Super. Ct. Jan. 26, 1999) (Judgment).  Judge Hiram Sánchez-Martínez
later wrote that "had this been a bench trial, he would have found
[Ramos] not guilty."  Id. at p. 11.[22]

---

[22] At that time Judge Sánchez-Martínez could have decided the motion for
acquittal even after the jury's guilty verdict.  Laws of P.R. Ann., tit. 34A,
App. II, R. 135, but did not.  Years later, in 2019, Judge Sánchez-Martínez
wrote a letter to the governor requesting executive clemency for Ramos.  In his
letter, Judge Sánchez-Martínez indicates that he always had doubts that Ramos
participated in the murders, that he heard no evidence which would link Ramos
to the murders and that the case is one of two for which he has not remained
satisfied.  (Docket No. 39, Ex. 1.)

Ramos and Meléndez appealed their convictions.  El Pueblo de P.R. v. Cruz, Case No. KLCE201701397, 2019 WL 2232528 at *4 (P.R. Cir. Mar. 13, 2019) (certified translation, Docket No. 52, Ex. 1). The Puerto Rico Court of Appeals ("Court of Appeals") subsequently denied their appeal.  Id.  The Puerto Rico Supreme Court affirmed this disposition on January 26, 1999, holding that "there was enough evidence for a jury to [infer] that all of the elements of murder in the first degree were present, and to connect the defendants to the crime."  Id. at *3.

More than a decade after the 1992 trial, a microscopic hair comparison of evidence recovered from Teresa's underwear excluded Ramos and Meléndez as the donor.  (Docket No. 39 at p. 28.)  On February 10, 2011, Ramos and Meléndez moved for a new trial pursuant to Puerto Rico Criminal Procedure Rule 192.1 ("Rule 192.1"), citing "(1) the alleged inappropriate conduct of Prosecutor Andrés Rodríguez-Elías, and (2) new evidence based on the results of a serological test of three pubic hairs taken from

underwear belonging to [Teresa] and one body hair found on a piece

of clothing belonging to [Eduardito]." Id. at p. 5.[23]

    The Court of First Instance denied this motion for two

reasons. First, Ramos and Meléndez knew of the alleged misconduct

at the time of trial but failed to assert a timely objection.

Cruz, 2019 WL 2232528, at *4. Second, microscopic hair comparisons

"existed in 1992." Id.[24] The Court of First Instance suggested

that Ramos and Meléndez perform a mitochondrial deoxyribonucleic

---

[23] Puerto Rico courts "may in like manner at the request of the defendant grant
a new trial if, after the sentence is pronounced, new facts or new evidence are
found of a nature tending to establish defendant's innocence." P.R. Laws Ann.
tit. 34, R. 192.1. Rule 192.1.1 provides that "[a]ny person who is imprisoned
by virtue of a judgment rendered by any Division of the Court of First Instance"
may move to vacate, set aside, or correct the judgment if:

    (1) The sentence was imposed in violation of the Constitution of
        the laws of the Commonwealth of Puerto Rico or of the
        Constitution and laws of the United States; or

    (2) The court lacked jurisdiction to impose such a sentence; or

    (3) The sentence imposed exceeds the penalty prescribed by law; or

    (4) The sentence is subject to collateral attack for any reason.

Id. R. 192.1.1.

[24] Sister jurisdictions have held that serological hair comparison is
"scientifically invalid and unreliable." See, e.g., In re Stevens, 956 F.32d
229, 238 (4th Cir. 2020).

acid ("mtDNA") test, but this technology "was not [yet] available in Puerto Rico." Id.[25]

On January 29, 2016, the Puerto Rico legislature enacted the Post Judgment DNA Analysis Act, P.R. Laws Ann. tit. 34, §§ 4201 et

---

[25] The Sixth Circuit Court of Appeals compared nuclear and mitochondrial DNA, explaining that:

> [E]very cell contains two types of DNA: nuclear DNA, which is found in the nucleus of the cell, and mitochondrial DNA, which is found outside of the nucleus in the mitochondrion. The use of nuclear DNA analysis as a forensic tool has been found to be scientifically reliable by the scientific community for more than a decade. The use of mtDNA analysis is also on the rise, and it has been used extensively for some time in FBI labs, as well as state and private crime labs. See, e.g., Micah J. Luftig & Stephen Richey, Symposium: Serenity Now or Insanity Later?: The Impact of Post-Conviction DNA Testing on the Criminal Justice System: Panel One: The Power of DNA, 35 New Eng. L. Rev. 609, 611 (2001). This technique, which generally looks at the differences between people's mitochondrial DNA, has some advantages over nuclear DNA analysis in certain situations. For example, while any given cell contains only one nucleus, there are a vast number of mitochondria. As a result, there is a significantly greater amount of mtDNA in a cell from which a sample can be extracted by a lab technician, as compared to nuclear DNA. Thus, this technique is very useful for minute samples or ancient and degraded samples. Ibid. In addition, mitochondrial DNA can be obtained from some sources that nuclear DNA cannot. For example, mtDNA can be found in shafts of hair, which do not have a nucleus, but do have plenty of mitochondria. Nuclear DNA can only be retrieved from the living root of the hair where the nucleus resides. United States v. Coleman, 202 F. Supp. 2d 962, 965 (E.D. Mo. 2002) (accepting expert testimony by Dr. Melton, the expert in this case, and admitting evidence based on mtDNA testing).

> On the other hand, mtDNA is not as precise an identifier as nuclear DNA. In the case of nuclear DNA, half is inherited from the mother and half from the father, and each individual, with the exception of identical twins, almost certainly has a unique profile. MtDNA, by contrast, is inherited only from the mother and thus all maternal relatives will share the same mtDNA profile, unless a mutation has occurred. Ibid. Because it is not possible to achieve the extremely high level of certainty of identity provided by nuclear DNA, mtDNA typing has been said to be a test of exclusion, rather than one of identification. Id. at 966.

United States v. Beverly, 369 F.3d 516, 528-29 (6th Cir. 2004).

*seq*.  Cruz, 2019 WL 2232528, at *4.[26]  A month later, Ramos and

Meléndez requested that the IFS perform an mtDNA analysis.  Id.

The Court of First Instance granted this motion without objection

from the Puerto Rico Department of Justice.  Id.

The IFS published the mtDNA report on September 28, 2016.

(Docket No. 55 at p. 11; Docket No. 46 at p. 3.)  This report

excluded Ramos and Meléndez from the population of potential

donors:  The hairs on Teresa's underwear belong to the victim or

a matrilineal relative.  Cruz, 2019 WL 2232528, at *5.

Ramos subsequently filed a second motion for a new trial

pursuant to Rule 192.1.  (Docket No. 39 at p. 14.)  A new trial is

warranted if:

> upon analyzing the new evidence along with the
> [evidence] presented during the original trial in the
> manner most favorable to the guilty verdict or ruling
> being challenged, **said evidence could have created
> reasonable doubt** in the trier of facts as to the guilt
> of the petitioner.

Cruz, 2019 WL 2232528, at *18 (citing Pueblo v. Marcano-Parrilla,

152 D.P.R. 557 (2000)) (emphasis in original); see People v.

Morales-Rivera, 1984 PR Sup. LEXIS 87 (official translation), 115

---

[26] A certified English translation of the Post Judgment DNA Analysis Act is not
yet available.  According to the Innocence Project, this legislation "grant[s]
statutory access to DNA testing which could prove innocence and enable law
enforcement to identify the truly guilty."  Nick Moroni, Puerto Rico Enacts
Post-Conviction DNA Testing Law (Dec. 30, 2015) (available as of Sept. 27, 2024
at https://innocenceproject.org/puerto-rico-enacts-post-conviction-dna-
testing-law/).

D.P.R. 107 (1984) (noting that Courts adjudicate Rule 192.1 motions by "[asking] whether said new evidence would have changed the guilty verdict in the present case").[27]

According to Ramos, the mtDNA analysis "irrefutably reveals that the pubic hairs collected from the panties belonging to [Teresa] do not belong to either of the two men unjustly convicted of this crime, whose motive was sexual assault and that, consequently, they are excluded as the murderers of [Teresa] and her two children." Cruz, 2019 WL 2232528, at *5.

The Court of First Instance granted Ramos' second motion for a new trial. Id. The mtDNA analysis was "relevant to the controversy as to the identity of the person who committed the crime, and not merely cumulative or rebuttal evidence." Id. The Department of Justice then appealed. Id. at p. 9.

The Court of Appeals, in an opinion by Judge Waldemar Rivera-Torres joined by Judge Luisa Colom-García, determined that the mtDNA analysis was unavailable in 1992, was not cumulative, and was credible. Cruz, 2019 WL 2232528, at *21-24. It held, however, that the mtDNA evidence "does not make it more probable that the respondents are innocent." Id. at *24. The Court of Appeals

---

[27] To prevail on a Rule 192.1 motion, the petitioner must also establish that the newly discovered evidence "(1) could not have been discerned with reasonable diligence before trial; (2) is not merely cumulative; (3) is not rebuttal evidence; [and] (4) is credible." (Docket No. 52, Ex. 1 at p. 16.) (citing Pueblo v. Rodríguez, 193 D.P.R. 987, 998-1000 (2015)).

reversed the Court of First Instance, holding that it abused its discretion in granting Ramos' motion for a new trial.  Id. at *24. Essentially, hairs found on the underwear of the deceased victim were immaterial in determining the identity of the would-be rapist and murderer.

Puerto Rico Court of Appeals Judge Carlos Salgado-Schwarz ("Salgado") dissented, noting that the Court of First Instance merely "[determined] that the scale of justice is no longer leaning slightly towards the side of guilt."  Id. at *37.  The majority misconstrued the Rule 192.1 standard of review, analyzing the newly discovered evidence "not only in a manner that is most favorable to the guilty verdict or judgment, but multiplied by 1,000."  Id. The majority opinion required Ramos and Meléndez to "prove their innocence," a feat not required by Rule 192.1 to obtain a new trial.  Id. at p. 34.  Judge Salgado cautioned that "[no] one should speak about the new evidence excluding or including [Ramos and Meléndez] from being at the scene of the crime, because at the end of this process, there is no witness who made any sworn statement as to the moment in which the crime took place."  Id. The Puerto Rico Supreme Court denied Ramos' subsequent petition for certiorari.  (Docket No. 39 at p. 15.)

## III. The Section 2254 Petition

Ramos filed a *pro se* section 2254 petition on October 27, 2020. (Docket No. 1.) The Court then granted Ramos' motion to proceed *in forma pauperis*. (Docket No. 14.) On April 23, 2021, Ramos filed an amended complaint with the assistance of counsel, the federal public defender. (Docket No. 39.)

Ramos set forth four causes of action. Id. First, he contends that due process "require[s] a new trial based on [the mtDNA] evidence," id. at p. 25, alleging that the court of appeals purportedly erred by concluding that "the new mitochondrial DNA evidence was not likely to change the result at trial" in violation of clearly established federal law. Id. at p. 35. Second, he asserts that the court of appeals relied on an "unreasonable determination of the facts in light of the evidence presented in the trial court evidentiary hearing." Id. at p. 4. Third, Ramos presents a claim of actual innocence. Id. at p. 5. Fourth, he argues that "cumulative trial errors, combined with new exculpatory evidence, render [his] trial fundamentally unfair." Id. at p. 49.

The respondents moved to dismiss Ramos' 2254 petition pursuant to Federal Rule of Civil Procedure 12(b)(6), maintaining that (1) the Puerto Rico courts "already adjudicated" the issues before this Court, (2) the statute of limitations precludes federal

*habeas corpus* relief, and (3) Ramos "[did] not comply with the actual innocence standard." (Docket No. 46.). The Court denied the respondents' motion to dismiss on September 13, 2022, ordering Ramos to "either amend the section 2254 petition to eliminate the non-exhausted cause of action (*i.e.* claim four), or move for dismissal of his entire petition without prejudice." Ramos-Cruz v. Carrau-Martínez, 627 F. Supp. 3d 114, 134 (D.P.R. 2022) (Besosa, J.).

Ramos filed his second amended petition for *habeas corpus* relief on October 22, 2022, eliminating the fourth cause of action in accordance with the Court's Rule 12(b)(6) disposition. (Docket No. 63.) The respondents answered the amended petition on October 24, 2022. (Docket No. 70.) The parties engaged in contentious litigation regarding English translations of the 1992 trial and Rule 192.1 transcripts. See Docket Nos. 71 and 76. The respondents "stress[ed] that the trial transcript contains 7,641 pages which [would] take considerable time to review." (Docket No. 76 at p. 6.) Ultimately, the Court ordered the respondents to file "all transcripts of all proceedings in the Commonwealth Court pertaining to defendant Ramos-Cruz" no later than February 28, 2023. (Docket No. 104.) The respondents did not file certified translations of the trial transcripts until nine months later, on November 17, 2023. (Docket No. 186, Exs. 1-11.) The respondents

answered Ramos' second amended petition on August 15, 2023.
(Docket No. 137.)   The parties subsequently filed supplemental
briefs.  (Docket Nos. 210, 213, 216, 223 and 224.)

## IV.   **The Anti-Terrorism and Effective Death Penalty Act**

Federal *habeas corpus* review of a state-court conviction is
governed by the Anti-Terrorism and Effective Death Penalty Act.
Foxworth v. St. Amand, 570 F.3d 414, 424 (1st Cir. 2009); 28 U.S.C.
§ 2254.  Petitioners invoke the AEDPA to invalidate "the judgment
authorizing [their] confinement."  Magwood v. Patterson, 561 U.S.
320, 321 (2010) (citation and quotation omitted).  Congress enacted
this statute "to further the principles of comity, finality, and
federalism."  Kholi v. Wall, 582 F.3d 147, 154 (1st Cir. 2009)
(quoting Williams v. Taylor, 529 U.S. 420, 436 (2000)).  Courts
"shall entertain an application for a writ of *habeas corpus* . . .
only on the ground that [the petitioner] is in custody in violation
of the Constitution or laws or treaties of the United States."  28
U.S.C. § 2254(a).

A state court conviction will survive *habeas corpus* review
unless the adjudication:

> (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme
> Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. § 2254(d).  "[W]hen the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion [*i.e.* the court of appeals' decision vacating the new trial disposition], a federal *habeas* court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable."  Porter v. Coyne-Fague, 35 F.4th 68, 75 (1st Cir. 2022) (quoting Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018)).

## A.    Section 2254(d)(2): Unreasonable Determinations of Fact

To prevail pursuant to section 2254(d)(2), Ramos must demonstrate that the court of appeals set forth factual determinations that are objectively unreasonable.  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Section 2254(e)(1) also provides that:

In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of the correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).  This provision is "equally applicable when a state appellate court, as opposed to a state trial court,

makes a finding a fact." <u>Norton v. Spencer</u>, 351 F.3d 1, 6 (1st Cir. 2003) (quoting <u>Sumner v. Mata</u>, 455 U.S. 591, 593 (1982)).

The "presumption of correctness" and "unreasonable determination" standards of review set forth in sections 2254(d)(2) and 2254(e)(1) both govern factual challenges to state court convictions, "[causing] some confusion" among the federal judiciary. <u>Teti v. Bender</u>, 507 F.3d 50, 57 (1st Cir. 2007). The Supreme Court has suggested in *dicta*, however, that section 2254(d)(2) "would apply to the final decision reached by the state court on a determinative factual question, while section 2254(e)(1)'s presumption of correctness would apply to the individual fact findings, which might underlie the state court's final decision." <u>Id.</u> at 58 (citing <u>Miller-El</u>, 537 U.S. at 341-42).

The relationship between sections 2254(d)(2) and 2254(e)(1) is a "question [that] remains open in this circuit." <u>Quintanilla v. Marchilli</u>, 86 F.4th 1, 17 (1st Cir. 2023). This Court need not determine which standard is applicable, however, because *habeas corpus* relief is warranted pursuant to both provisions. <u>Id.</u> (recognizing the tension between sections 2254(d)(2) and 2254(e)(1), but declining to "resolve the question" because the petitioner failed to satisfy either standard); <u>Wood v. Allen</u>, 558 U.S. 290, 304-05 (2010) ("Because the resolution of this case does

not turn on them, we leave for another day the questions of how
and when section 2254(e)(1) applies in challenges to a state
court's factual determinations under section 2254(d)(2)").

## V.    The Puerto Rico Court of Appeals Relied on Unreasonable Determinations of Fact

The Court of First Instance ("CFI") granted Ramos' motion for
a new trial on June 13, 2017, holding that the "results of the DNA
tests [. . .] is the type of new evidence that would make a
different result probable." Cruz, 2019 WL 2232528, at *9. This
disposition was issued after a three-day evidentiary hearing and
oral argument. (Docket No. 166, Exs. 1-4.)

On March 13, 2019, the court of appeals held that the "CFI
clearly and unequivocally abused its discretion when it granted a
new trial to [Ramos and Meléndez]." Cruz, 2019 WL 2232528, at
*12. This decision is fraught with unreasonable factual
determinations, however, compelling this Court to grant the relief
requested by Ramos. Specifically, the factual determinations
regarding the fifth prong of the Rule 192.1 analysis rest on the
court of appeals' flawed and incomplete rendition of the record.

As a preliminary matter, the court of appeals' decision
contains *dicta* that is inconsistent with the record. The court of
appeals disagreed with the CFI's finding that "the mtDNA is more

convincing, conclusive and discriminating than the microscopic hair comparison." Cruz, 2019 WL 2232528, at *22.

Forensic serologist Roberto López-Arroyo ("López") stated that he conducts a hair comparison by "basically [placing] the hairs on a slide [under] a microscope and [observing] them." (Docket No. 166, Ex. 2 at p. 52.)  The comparison "depends on the [analyst's] power of observation." Id. at p. 60. López examined the sample and reference hairs, concluding that Ramos and Meléndez "were excluded" as donors. Id. at p. 25. His report stated, however, that the hairs "must be submitted to a mitochondrial DNA analysis." Id. at p. 27.

Phillip Hopper ("Hopper"), a DNA analyst at the Serological Research Institute, testified that after DNA is extracted from a sample hair strand:

> mitochondrial DNA is copied in a process called amplification to make more copies of the mitochondrial DNA so [that analysts] can determine the exact sequence of [a] small portion of the mitochondrial DNA present in the hair.

(Docket No. 166, Ex. 3 at p. 17.)  Analysts then identify the four components that comprise the "structure of DNA," label these components with "different color dyes," and "determine the exact order" of the resulting sequence. Id. at p. 18.  "Once a sequence is determined, [analysts] can compare that sequence to the sequence from the victim [and] suspect." Id. at p. 18.  The mtDNA analysis

conducted by Hopper revealed that "the hairs from [Teresa's] clothing was different from the sequence of Mr. Meléndez and Mr. Ramos." Id. at p. 22. In Hopper's opinion, "the hairs found on [Teresa] could not have originated from the two suspects." Id.

López and Hopper both testified that the mtDNA analysis is more conclusive than a microscopic hair comparison. (Docket No. 166, Ex. 2 at pp. 46-47.) Indeed, Hopper disclosed that "[hairs] from different people can look similar," and that he previously "tested other hairs which look similar [but] ended up giving different mitochondrial results." Id. at p. 55. The Court recognizes that microscopic hair comparison may, in certain circumstances, constitute credible evidence. To undermine the CFI's determination that a mtDNA analysis is more conclusive than a microscopic hair comparison, however, defies logic and disregards testimony presented at the Rule 192.1 hearing. Moreover, the CFI's determination regarding microscopic hair

comparison corresponds to prevailing beliefs among the scientific community.[28]

### A. No Evidence Suggests that the CFI Omitted Facts From its Rule 192.1 Analysis

The Supreme Court has held that a state appellate court's "determination of what the trial judge found is an issue of historical fact" subject to review pursuant to sections 2254(d)(2) and 2254(e)(1). Parker v. Dugger, 498 U.S. 308, 320 (1991) ("What the Florida Supreme Court could not do, but what it did, was to ignore the evidence of mitigating circumstances in the record and misread the trial judge's finding regarding mitigating circumstances, and affirm the sentence based on a mischaracterization of the trial judge's findings."); see Williams v. Rhodes, 354 F.3d 1101, 1108 (9th Cir. 2004) ("On *habeas* review, state appellate court findings – including those that interpret unclear or ambiguous trial court rulings – are entitled to the same presumption of corrections that we afford trial court

---

[28] In 2009, the National Academies of Science determined that "testimony linking microscopic hair analysis with a particular defendant is highly unreliable. In cases where there seems to be a morphological match (based on microscopic examination), it must be confirmed using mtDNA analysis; microscopic studies alone are of limited probative value." Nat'l Academies of Sci., Strengthening Forensic Science in the United States (2009); see Smuel D. Hodge, Jr. and Amelia Holjencin, A post-Morten Review of Forensic Hair Analysis: A Technique Whose Current Use in Criminal Investigations in Hanging on by a Hair, 64 St. Louis L.J. 219, 228 (2020) ("The death knell of microscopic hair analysis in a forensic context occurred in April 2015 when the FBI issued a bombshell admission that members of its staff had provided inaccurate testimony dealing with microscopic hair analysis for more than twenty years thereby leading to the conviction of innocent people.").

findings" pursuant to section 2254(e)(1)).  Accordingly, the court

of appeals' "determination of what [the CFI] said" is subject to

*habeas corpus* review pursuant to sections 2254(d)(2) and

2254(e)(1).

The court of appeals misconstrued the CFI's opinion and

order, holding that the CFI "**ignored** important facts that could

not be disregarded and, at the same time, assigned great weight

and value to irrelevant and immaterial facts, clearly abusing its

discretion." Cruz, 2019 WL 2232528, at *22 (emphasis added).  For

instance, the CFI cited testimony adduced by Eluzmindrina

Feliciano-González, who placed Morales at Teresa's residence on

June 27, 1989.  Id.; see Docket No. 186, Ex. 8 at p. 150.  The

court of appeals held, however, that the CFI "**omitted** the fact

that during the trial a second visual inspection was carried out

for the sole purpose of verifying said testimony, since there was

a distance of ten (10) houses between her house and the victim's

house." Id. (emphasis added).  The CFI allegedly "**disregarded** the

testimonies of the auto mechanic, Frank Álvarez-Navaro, and of

Mr. Mario Antonio Salgado-Castrello ["Salgado"], as to the vehicle

belonging to Mr. Eduardo Morales." Id. at *26 (emphasis added).

Moreover, the court of appeals held that the "CFI erred when it

**failed to assess all of the evidence** admitted during the trial,

and only considered part of the testimony to conclude that the new

evidence would probably produce a different result." Id. at *27
(emphasis added). According to the court of appeals, the CFI
"should not have **ignored** the strength of the evidence presented in
the trial, an important factor to be taken into account when
considering a motion for a new trial." Id. at *29 (emphasis
added). The CFI purportedly "[**ignored**], without any reason, the
circumstantial evidence that was submitted during the trial." Id.
at *29 (emphasis added).

        The CFI and court of appeals' assessments of the evidence
differed from each other. This disagreement does not, however,
prove that the CFI "ignored," "disregarded," "omitted," or "failed
to assess" evidence. A court need not enumerate every fact it
considered in adjudicating a motion for a new trial in its written
disposition. Rule 192.1 mandates that Puerto Rico courts analyze
"new evidence along with the [evidence] presented during the
original trial in the manner most favorable to the guilty verdict."
Id. at *18 (citing Marcano-Parrilla, 152 D.P.R. 557). Nothing in
the record suggests that the CFI ignored or omitted facts in its
analysis. In fact, the CFI reviewed the trial evidence and listed
exhibits provided by the Puerto Rico Supreme Court. (Docket
No. 166, Ex. 1 at pp. 9-10.) The litigants also provided the CFI
with the trial transcripts. (Docket No. 166, Ex. 4 at p. 33.)
Essentially, the absence of a fact in an opinion and order does

not necessarily establish that the court issuing the disposition omitted or ignored this fact in its concomitant analysis.

The court of appeals faults the CFI for not considering certain testimony from the trial record, a conclusion based on a premise that has no support in the record. Barring evidence to the contrary, an appellate court presumes that the trial judge reviewed the record. See, e.g., United States v. Wilfred Am. Educ. Corp., 953 F.2d 717, 719-20 (1st Cir. 1992) ("We will not presume that the district court declined to consider the relevant section 3622(a) evidence contained in the record"); United States v. Sutton, 105 F.4th 1083, 1088 (8th Cir. 2024) ("We assume the record before us is a complete record of the materials that the district court viewed and considered). For example, the court of appeals refrained from addressing law enforcement's failure to preserve the crime scene or the discovery of the purported murder weapon at Morales' house months after the murders. This Court cannot infer, based on this premise alone, that the court of appeals ignored the haphazard destruction of evidence and questionable discovery of the knife in conducting its analysis.

The court of appeals' flawed interpretation of the CFI's Rule 192.1 decision constitutes an "unreasonable determination of the facts." 28 U.S.C. §§ 2254(d)(1)-(e)(1). Accordingly, the Court **GRANTS** Ramos' section 2254 motion.

**B.    The Court of Appeals Misconstrued the Trial Evidence**

The court of appeals based its decision on an erroneous assessment of the record, constituting an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Id.  In 1992, Bárbara and José both claimed that Ramos and Meléndez manufactured an "excuse" to enter Teresa's house on the night of her murder.  José revealed that these fabrications served a singular purpose:  to sexually assault Teresa.  Testimony pertaining to this purported scheme is set forth below.

> **Rodríguez:** Mr. Witness, can you tell the ladies and gentlemen of the Jury what, if anything, happened once you arrived and placed yourself underneath that light pole, joining Mr. Juan Carlos Meléndez and Antonio Ramos-Cruz?
>
> **José:** At that time, well, when my sister left [Teresa's] house and went to my house, uh . . . I stayed with them and we started making small talk . . .
>
> **Rodríguez:**  Talking.  What was that small talk?
>
> **José:** You know, ordinary things, uh, things about work, and then we started talking about Teresa . . .
>
> **Rodríguez:** What did you talk about Teresa?
>
> **José:** Uh . . . what she was like, how she was, that she was really hot [. . .] And then, at that time we started talking jokingly about how to get with her to put it in her.
>
> **Rodríguez:** To put it in her . . . In other words, who was in that conversation there at that time?

**José:** [Meléndez] and [Ramos][29]

[. . .]

**Rodríguez:** What, if anything, did you do when [Meléndez] mentioned the fact about putting it inside Teresa?

**José:** Well, at the moment . . . uh . . . at the moment I laughed . . . since we were joking around, I didn't take it seriously [. . .] and pretty much, no, like they say, I didn't, I didn't have that malice, and when he told me that, I kind of went with the flow, right?  And at that moment we kept talking about that . . .

**Rodríguez:** What else did you talk about?

**José:** Well, how to get inside [Teresa's] house, uh, like how we were going to get inside [. . .] we were going to go inside, if when she came out, we were going to go inside, some excuse [. . .] At that time, well, Teresa came outside . . .

[. . .]

**Rodríguez:** And what happened when [Ramos or Meléndez] asked Teresa for water?  If anything happened?

---

[29] The Court cites the certified English translation of the trial transcripts submitted by the Commonwealth pursuant to the Rules Governing Section 2254 Cases.  (Docket No. 186, Exs. 1-11.)  The decision issued by the court of appeals does not state that Ramos and Meléndez "talked jokingly how to get with her to put it in her."  According to the court of appeals, José proffered the following testimony:

**Rodríguez:** What did you talk about regarding Teresa?

**José:** Im . . . what she was like, how she looked, that she was really fine [. . .]  Then, well we started talking at that time well we started talking jokingly about what it would be like to be with her, **to screw her.**

**Rodríguez:** To screw her . . . So, and who was there at that time in that conversation there?

**José:** [Meléndez] and [Ramos].

<u>Cruz</u>, 2019 WL 2232528, at *37(emphasis added).

**José:** At that time, I was going to go to . . . to my house but one of them said, "This is the opportunity," and I said "Opportunity to what?"  "To deal with her." And I said, "No, no, no, I am not going to be doing that; I am not going to be in the plot.  "No, you sissy; fuck off."  And then, well, I didn't . . . I ignored them and I left.

(Docket No. 186, Ex. 6 at pp. 92-97.)

**Bárbara:** At that point [Meléndez] told me to take [Teresa's] key . . .

[. . .]

**Rodríguez:** The keys to what?

**Bárbara:** To the house.

**Rodríguez:** for what, if you know?

**Bárbara:** I asked him, and he told me in order to have an excuse to talk to her. I went up to [Teresa's] house for moment and took them.

(Docket No. 186, Ex. 8, at p. 226-27.)  Testimony provided by the Martínez siblings served as the sole evidence linking Ramos and Meléndez to the crime scene.  No other circumstantial or physical evidence placed them inside Teresa's house in the early morning hours of June 26, 1989.

The mtDNA analysis performed on the hairs collected from Teresa's underwear exclude Ramos and Meléndez as the donor:  The hairs originated from Teresa herself or a matrilineal relative. (Docket No. 166. Ex. 3 at p. 22.)  Consequently, these results undermine critical testimony adduced at trial by Bárbara and José.

Ramos and Meléndez allegedly conspired for hours on Calle 2 in Trujillo Alto, conjuring an excuse to initiate a conversation with Teresa to "put it in her." See Cruz, 2019 WL 2232528, at *37 ("If there's one thing that the undersigned judge can be sure it is that the only place that sexual aggression was eliminated from in these proceedings was from the charges, since the transcription of the trial on the merits indicates that the sexual act was the motivation for the commission of the crime of murder.") (Salgado-Schwarz, J., dissenting).  By eliminating Ramos and Meléndez as the source of the pubic hair recovered from the murder victim's underwear, the mtDNA analysis tends to negate the proposition that they sexually assaulted Teresa.  This evidence contradicts the narratives presented by Bárbara and José.[30]

---

[30] The court of appeals stated that "it [did] not examine the theories of the parties stated in their final reports contained in the transcripts of the evidence of the original trial because they do not constitute evidence."  *22. It did, however, in the following sections of its opinion.  The court of appeals determined that "a different result from the guilty verdict would probably [not] be reached" in part because the "District Attorney argued during the trial that the motive of the murder was having sexual relations with the victim (enjoying her)."  Cruz, 2019 WL 2232528, at *31.

The court of appeals assumed an extreme position, denying that the mtDNA analysis is relevant and material in any way to this case despite clear and convincing evidence to the contrary.[31] It repeated this misguided proposition throughout its decision, stating that:

> "The results of the mtDNA test as new supplementary evidence do not rebut the testimony of the Martínez siblings (in terms of credibility), and much less do they change the central facts as narrated by them and believed by the jury." Cruz, 2019 WL 2232528, at *28.

> "In short, the new evidence of the mtDNA results does not in any way diminish the evidentiary value of the testimony discussed [in the Court of Appeals' opinion]." Id.

> "[The mtDNA analysis] also does not allow us to rebut any of the central facts proven during the trial to create any doubt in terms of a third person being in the time and place of the murders." Id.

> "Furthermore, the new evidence alluded to by [Ramos and Meléndez] does not add or subtract any evidentiary value from the evidence presented during trial." Id.

> "[The] new supplementary evidence submitted lacks the element of having a certain level of importance with regards to the evidence submitted at trial." Id. at *31.

> "The defense's theory and the grounds on which they base their request for a new trial in no way rebut, minimize, or refute all of the evidence weighed by the jury in the trial resulting in the verdict of guilty." Id.[32]

> "We reiterate that the results of the mtDNA test have no use whatsoever to place [Ramos and Meléndez] outside of the scene of the crime." Id. at *31.

31 The distinction between legal analysis and findings of fact is paramount. Section 2254(d)(1) governs the petitioner's request for *habeas corpus* relief if the state court "[applied] a legal rule that contradicts an established Supreme Court precedent or [reached] a different result on facts materially indistinguishable from those of a controlling Supreme Court precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (quoting 28 U.S.C. § 2254(d)(1). In contrast, a "state court's factual findings are entitled to a presumption of correctness that can be rebutted only by clear and convincing evidence [pursuant to sections 2254(d)(2) and 2254(e)(1)]." Ouber v. Guarino, 293 F.3d 19, 27 (2002). Distinguishing questions of law from fact "is sometimes slippery." Thompson v. Keohane, 516 U.S. 99, 110-11 (1995) (citing Wainwright v. Witt, 469 U.S. 412, 429 (1985) ("It will not always be easy to separate questions of 'fact' from 'mixed questions of law and fact' for section 2254(d) purposes.")).

The First Circuit Court of Appeals has held that section 2254(d)(1) applies exclusively to determinations of "basic, primary, or historical fact," while inferences, characterizations of the facts, and mixed questions of fact and law generally fall within the purview of section 2254(d)(1). Ouber, 293 F.3d at 27. Section 2254(d)(1), the province of mixed questions of law and fact, encompasses the application of a legal standard to the historical-fact determinations." Townsend v. Sain, 372 U.S. 293, 309 n.6 (1963). Courts have applied section 2254(d)(2) to *habeas corpus* petitions involving questions that extend beyond the historical facts of the case. See Maggio v. Fulford, 462 U.S. 11, 117 (1983) (per curium) (applying section 2254(d)(2) to questions concerning the defendant's competency to stand trial); Wainwright, 469 U.S. at 429 ("The trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record. These are the 'factual issues that are subject to section 2254(d).'"); Tolbert v. Page, 182 F.3d 677, 684 (9th Cir. 1999) (applying section 2254(d)(1) to the state court's determination regarding *prima facie* showing of racial discrimination and discriminatory intent pursuant to Batson); Jeffreis v. Blodgett, 5 F.3d 1180, 1189 (9th Cir. 1993) (applying section 2254(d)(2) to a question of alleged jury bias resulting from pretrial publicity).

Asserting that the mtDNA analysis is irrelevant to the murder conviction is a factual determination requiring no application of any legal standard. The court of appeals also assessed witness credibility, invoking the standard set forth in section 2254(d)(2). See Cruz, 2019 WL 2232528, at *28 (holding that the mtDNA tests as new supplementary evidence do not rebut the testimony of the Martínez siblings (in terms of credibility)"). Accordingly, section 2254(d)(2) is the operative *habeas corpus* provision because this assessment constitutes a "[fact] in the sense of a recital of external events and the credibility of their narrators." Sanna v. Dipaolo, 265 F.3d 1, 7 (1st Cir. 2001) (citation omitted).

"The new supplementary evidence also does not satisfy, as we have seen, the degree of relevance and sufficiency to rebut all the evidence submitted at trial." Id.

"[We] are forced to conclude that the new supplementary evidence does not have a direct of proportional relationship to the main fact that [Ramos and Meléndez] seek to prove, that is, that they are excluded in a true and incontrovertible manner from being at the scene of the crime or from having any contact with [Teresa] or her children." Id. at *32.

The court of appeals repeatedly diminished the mtDNA analysis, failing to grasp the following fact: proof tending to exclude would-be rapists from a murder scene, particularly when sexual assault allegedly motivated the suspects in committing this offense, is relevant. See Espinal v. Bennett, 588 F. Supp. 2d 388, 418 (E.D.N.Y. 2008) (granting a habeas corpus petition pursuant to section 2254(d)(2) because the "state court unreasonably assessed the facts of this case by concluding that the redacted report did not support the petitioner's alibi claims"). Jurists may dispute the proper weight to assign the mtDNA analysis, but to completely reject the materiality of this

---

[32] This Opinion and Order is based exclusively on sections 2254(d)(1) and 2254(e)(1). The unreasonable factual determinations set forth by the Court of Appeals entitle Ramos to the remedies afforded to him by law. The Court notes, however, that the legal reasoning adopted by the Court of Appeals is suspect. It does not cite, and this Court is unaware of, any authority requiring a defendant seeking relief pursuant to Rule 192.1 to "refute all of the evidence." Cruz, 2019 WL 2232528 at *31. The applicable standard merely mandates that the newly discovered evidence "could have created a reasonable doubt in the mind of the trier of facts." Cruz, 2019 WL 2232528, at *18 (citing Marcano-Parrilla, 152 D.P.R. 557). Judge Carlos Salgado-Schwarz noted this misapplication of the law in his dissent, arguing that the CFI need not "undermine the evidence of the original trial" to grant the Rule 192.1 motion. Id. at *37.

evidence is an unreasonable determination of the facts. See Miller-El, 537 U.S. at 340 ("A federal court can disagree with a state court's credibility determination and, when guided by the AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.").

The court of appeals committed the same error regarding Teresa's underwear. It held that "the female lingerie, as an article of evidence against [Ramos and Meléndez], was not material with regards to the guilty verdict." Cruz, 2019 WL 2232528, at *30. According to the court of appeals, "the article of female clothing lacks relevance to prove the elements of the crimes of murder or a violation of the Weapons Act of which respondents were accused and found guilty." Id. Medical technologist Leida Rodríguez-Vélez testified, however, that there "was an absence of semen" on Teresa's shorts, underwear, and sweater. (Docket No. 189, Ex. 6 at p. 18.) Luis Campos observed pink underwear on Teresa at the crime scene. (Docket No. 186, Ex. 3 at p. 57.) The court of appeals' classification of this evidence belies the trial record, constituting an unreasonable determination of fact.

This Court defers to the court of appeals' factual determinations pursuant to section 2254. Dunn v. Reeves, 584 U.S. 731, 733 (2021) ("Federal habeas courts must defer to reasonable state-court decisions"). Deference does not, however, "imply

Civil No. 20-1589 (FAB)                                              79

abandonment or abdication of judicial review.  Deference does not by definition preclude relief." <u>Miller-El</u>, 537 U.S. at 340.  The record demonstrates, by clear and convincing evidence, that the factual determinations adopted by the court of appeals are unreasonable.  Accordingly, the Court **GRANTS** Ramos' section 2254 petition.

## VI.  Conclusion

For the reasons set forth below, Antonio Ramos-Cruz's second amended petition for *habeas corpus* relief is **GRANTED.**  (Docket No. 63.)  This case is **DISMISSED with prejudice.**  The Commonwealth of Puerto Rico is directed to retry Antonio Ramos-Cruz within sixty days or to release him from custody.  Judgment shall be entered accordingly.

The motion at Docket No. 214 is **GRANTED.**  <u>See</u> Minutes at Docket No. 217.

The motions at docket numbers 159, 164, 204, and 213 are **DENIED as moot.**

Because this final order is not adverse to Ramos, the Court need not issue or deny a certificate of appealability.  Rule 11 of the Rules Governing Section 2254 Cases.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, September 30, 2024.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
SENIOR UNITED STATES DISTRICT JUDGE